[No. 33333-3-II. Division Two. June 27, 2006.]

DAPHNE CLARKE, *Appellant*, v. THE OFFICE OF THE ATTORNEY GENERAL, *Respondent*.

768

*John R. Scannell*, for appellant.

*Robert M. McKenna, Attorney General*, and *Helen Arntson* and *Aaron V. Rocke, Assistants*, for respondent.

¶1 VAN DEREN, J. — Daphne Clarke appeals the trial court's discovery rulings and its summary judgment order in favor of the State of Washington on her claims for hostile work environment and discrimination. Clarke argues that the trial court erred when it (1) granted the State's motion to compel production of her tax returns, (2) denied her motions to compel discovery, and (3) granted summary judgment in favor of the State. We affirm.

## FACTS

A. Employment History

¶2 Daphne Clarke began working for the State of Washington in 1995. From 1995 to 1998, she worked with several State agencies as a clerk, clerk typist, and office assistant. In January 1999, Clarke transferred from the Department of Social and Health Services to the General Services Unit (GS) in the Tacoma Attorney General's office (AGO), where she worked under supervisor Marcia Binger. GS handled telephone and in-person reception, mail pick up and distribution, conference room and copier maintenance, coordination of State-owned vehicles, copying, and other similar tasks.

¶3 Binger began receiving complaints about Clarke's work performance as early as March 1999. For example,

one such complaint occurred in May 1999, when a writing class instructor complained that Clarke failed to prepare a classroom despite being instructed to do so. When Binger brought the issue to Clarke's attention, Clarke refused to discuss it.

¶4 In June 1999, during employee ergonomics training, Binger instructed Clarke to reposition her workstation for proper alignment, but Clarke later returned her computer monitor to an ergonomically improper position. Clarke turned her back on Binger as she tried to talk to her about the ergonomics issue and Binger "lost [her] cool," slammed her umbrella on a work table, and pulled Clarke's chair around to face her. Clerk's Papers (CP) at 434. Clarke said that Binger almost made her fall out of her chair. Binger apologized.

¶5 Complaints continued about Clarke's work, including Clarke's failure to restock the copiers with paper, failure to follow directions, and sloppy work. But Clarke also received some positive comments for some work. For example, in July 1999, David Waterbury, senior counsel for the Medicaid Fraud Control Unit, sent Clarke a memo praising her work on a copying project for his unit. Clarke received another positive letter in July 1999, for work she did on a Pierce County Courthouse tour.

¶6 In October 1999, Binger conducted Clarke's performance review. The review outlined several problems with Clarke's work performance, including improper or incomplete handling of faxes, copy projects, and conference room set-up for training sessions. The review included solutions and plans to address each problem area. Binger also communicated positive feedback and stated that Clarke was making progress with her communications skills. Clarke refused to sign the review form.

¶7 In December 1999, Binger sent Clarke a memo praising her improvement at GS. In March 2000, Binger conducted Clarke's second performance review, which contained generally positive feedback. Binger retired at the

end of March 2000, and in April 2000, Fran Baldauf became Clarke's supervisor.

¶8 In May 2000, Baldauf received notice from the parking garage supervisor that a State car had been taken out of the garage at 8 PM the night before and was not returned until 6 AM that morning. Baldauf questioned the staff about the unusual car use and Clarke told Baldauf that an employee had checked the car out the day before but had returned it by 5 PM. Clarke did not indicate that she knew anything about the use of the car. Several hours later, Clarke confessed to Baldauf that she had taken the car because her husband had been unable to pick her up and she needed the car to get home. Clarke offered to resign, but Baldauf rejected the offer.

¶9 Thereafter, Baldauf received complaints that Clarke misdirected the mail, performed poorly on photocopying assignments, and failed to meet deadlines. After Baldauf spoke to Clarke about the complaints, Clarke would often engage in embarrassing confrontations with the complaining persons at GS.

¶10 In August 2000, Assistant Attorney General (AAG) Jennifer Boharski reported to Baldauf that Clarke had made inappropriate comments to a State witness. She reported that a witness who feared retaliation from her coworkers had come to the Tacoma AGO to report alleged patient abuse at a State hospital. Clarke was at the reception desk when the witness arrived and she questioned the witness about the purpose of the meeting. When Clarke learned where the witness worked, Clarke told her that she had a friend who also worked there and that the witness should not say too much in her meeting. Subsequently, the witness's coworkers retaliated against her. Baldauf referred the AAG's report to human resources.

¶11 Also in August 2000, while Clarke was out of the office, another staff member found two batches of unopened mail tucked away on top of a supply shelf. The mail had been delivered to GS in December 1999, a time when Clarke was responsible for sorting and distributing mail. The mail

contained important legal notices and consumer complaints. As a result of this discovery, Baldauf searched Clarke's work area where she found a "long overdue" and incomplete inventory project, undelivered copies of a judgment and consent decree, and a notice of hearing. CP at 278. When Clarke returned to the office in September, Baldauf discussed Clarke's failure to properly carry out her assigned work duties.

¶12 Then, in late 2000, after Clarke failed to complete yet another project as instructed, Baldauf directed her to correct the mistake. Instead, Clarke walked out of Baldauf's office.

¶13 In January 2001, the State informed Clarke that it was considering taking disciplinary action against her for her interaction with the witness, inappropriate interaction with her supervisor, and her unsatisfactory performance on several projects. It also temporarily reassigned Clarke to the GS office in Olympia.

¶14 When human resources gave Clarke notice of the disciplinary proceedings, it told her she could leave the office for the rest of the afternoon and that she could take her personal belongings but that she did not need to clean out her desk because the reassignment was only temporary. Clarke began going through documents at her workstation and placed them in boxes that she planned to remove. But Clarke's supervisors noticed that some of the packed documents were not her personal property. They instructed her to leave all work documents at the Tacoma office. Clarke then began destroying documents and ignored directions to gather her belongings and leave immediately. Eventually, the police had to remove Clarke from the office.

¶15 The State reassigned Clarke to home and initiated disciplinary proceedings against her. Clarke refused to attend the proceedings but provided written responses. Ultimately, in March 2001, the State decided to terminate

Clarke. But Clark resigned just before the State terminated her.[1]

¶16 In June 2001, Clarke filed a claim with the Equal Employment Opportunity Commission (EEOC). After investigating Clarke's claim, the EEOC found no violation.

B. Procedural History

¶17 Clarke filed a claim for hostile work environment against the State on March 16, 2004. She filed a complaint for employment discrimination and wrongful termination on May 19, 2004, and served it on June 2, 2004. Clarke alleged that she was "continually subjected to a hostile work environment"; that she was not promoted or given opportunities for career growth because of discrimination based on her race, ethnicity, and national origin; and that she was terminated from her job due to discrimination. CP at 19. She alleged that she suffered damages, although she never responded to the AGO's request for a statement of damages.

¶18 During discovery, the State requested, among other things, copies of Clarke's income tax returns for the seven years prior to Clarke's lawsuit. When Clarke refused to produce them, the State moved to compel their production. Clarke opposed the motion but the court granted it and ordered Clarke to produce the documents within 14 days. Clarke moved to stay the order on behalf of her husband so he could intervene to seek a protective order.[2] The court denied the motion.

¶19 On March 4, 2005, the State provided answers to Clarke's interrogatories but it did not answer interrogatories 45 and 46 because the number of interrogatories

---

[1] In oral argument, the parties clarified that the State gave its 10-day termination notice on March 21, 2001, that Clarke resigned April 1, 2001, and that Clarke's last day of work in the office was January 24, 2001.

[2] The State sought only to compel Clarke's tax returns, but it appears that Clarke and her husband file jointly, thereby making his tax information unavoidably discoverable.

exceeded the allowed number under Pierce County Local Rule (PCLR) 1(h)(3).[3]

¶20 Interrogatory 45 asked:

Have you kept records regarding the effects of your employment decisions, including making employment decisions, such as hiring, retention, promotion, transfer, demotion, dismissal or referral as required by the uniform employee selections guidelines 41 CFR 60-3.4?

CP at 927.

¶21 Interrogatory 46 asked:

If the answer to the preceding interrogatory is yes, provide the information in a format that can be used to analyze the possible adverse impact of each of the different types of employment decisions mentioned above, by race, sex, age both through the attorney general's office and statewide for all classifications that are utilized by the attorney General's office.

CP at 927.

¶22 After the parties met to discuss Clarke's requests, as required by rules of civil procedure (CR) 26(i),[4] the State agreed to answer interrogatories 45 and 46 but it told Clarke that it did not agree that the federal regulations cited in interrogatory 45 applied to the State. The State also informed Clarke that it did not compile records solely for the purposes of the federal regulation but that it did maintain the requested records.

¶23 On March 31, the State agreed to provide a list of all classified employees hired at the AGO between 1993 and

---

[3] PCLR 1(h)(3) reads in pertinent part: "Interrogatories shall be limited to thirty-five (35) in number."

[4] CR 26(i) states:

The court will not entertain any motion or objection with respect to rules 26 through 37 unless counsel have conferred with respect to the motion or objection. Counsel for the moving or objecting party shall arrange for a mutually convenient conference in person or by telephone. If the court finds that counsel for any party, upon whom a motion or objection in respect to matters covered by such rules has been served, has willfully refused or failed to confer in good faith, the court may apply the sanctions provided under rule 37(b). Any motion seeking an order to compel discovery or obtain protection shall include counsel's certification that the conference requirements of this rule have been met.

the present, specifying the name, appointment date, classification, division location, position number, personnel actions taken, gender, age at appointment, race, ethnicity, current agency and appointment, and current agency address. The State also agreed to provide similar information about the employees at the Tacoma AGO. Clarke's attorney made an appointment to view the material, but he did not keep the appointment or reschedule it.

¶24 On March 25, 2005, the State moved for summary judgment. On April 14, 10 days after the discovery cutoff date of April 4,[5] Clarke filed a motion to compel the State to provide additional responses to interrogatories 45 and 46; for a continuance of the summary judgment motion; and to compel the deposition of the former attorney general, and current governor of the state of Washington, Christine Gregoire.

¶25 The court heard oral argument on Clarke's motions and the State's summary judgment motion. It denied Clarke's motions and granted summary judgment to the State.

¶26 Clarke appeals.

## ANALYSIS

A. Discovery Issues

¶27 It is within the trial court's discretion to deny a motion to compel discovery and we will not disrupt the ruling absent an abuse of discretion. *Shields v. Morgan Fin., Inc.*, 130 Wn. App. 750, 759, 125 P.3d 164 (2005). A court abuses its discretion when it bases its decision on unreasonable or untenable grounds. *Brand v. Dep't of Labor & Indus.*, 139 Wn.2d 659, 665, 989 P.2d 1111 (1999).

1. Clarke's Tax Returns

¶28 Clarke argues that the court erred when it compelled her to produce her tax returns, which she asserts

---

[5] PCLR 1(h)(3) reads in pertinent part: "Standard cases shall have a discovery cutoff of 45 weeks."

are privileged. The State counters that Clarke's tax records were relevant to her claim for damages and, even if the court erred, any error was harmless.

¶29 Parties to a lawsuit may discover any relevant matter. CR 26(b)(1). Evidence is relevant if is has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. And our Supreme Court has held that tax returns are not privileged. *Dien Tran v. State Farm Fire & Cas. Co.*, 136 Wn.2d 214, 227, 961 P.2d 358 (1998) (holding that an insurance company could request financial information and tax documents from a policy holder).

¶30 Here, Clarke's tax records were relevant because they directly related to her claim for damages. Although she failed to specify what damages she sought, the State could anticipate that it was likely that she would claim damages for lost wages and her earnings were relevant to that issue. Further, her tax returns would indicate whether she had mitigated any claimed damages through other employment.

¶31 We hold that the trial court did not abuse its discretion when it granted the State's motion to compel Clarke to produce her tax returns.

2. Clarke's Motion to Compel

¶32 Clarke argues that the trial court erred when it refused to compel answers to interrogatories 45 and 46 and failed to compel the governor's testimony. She argues that 41 C.F.R. § 60-3.4 requires the State to maintain records showing the basis and impact of its employment decisions and that the trial court erred when it did not require the State to answer interrogatories 45 and 46 in the manner she insisted on. The State counters that the trial court did not err because (1) Clarke's motion was untimely, (2) the trial court lacked authority to hear the motion because Clarke failed to engage in a CR 26(i) discovery conference,

(3) the State adequately responded to interrogatories 45 and 46, and (4) the information Clarke requested would not have defeated summary judgment on her stated claims.

### a. Timeliness

¶33 The State first argues that Clarke's April 14 motion to compel was untimely because it occurred after the discovery cutoff date under the case management schedule. Clarke counters that it was timely.

¶34 The record does not contain the assigned case management schedule, but PCLR 1(h)(3) states that discovery ends 45 weeks from the filing date. Here, Clarke filed her complaint on May 19, 2004. She filed the motion to compel on April 14, 2005, roughly 46 weeks from the filing date. But her interrogatories were served on the State within the 45-week time frame. Thus, we find that Clarke's motion to enforce compliance with outstanding discovery requests was timely.[6]

### b. Trial Court's Authority To Hear Clarke's Discovery Motions under CR 26(i)

¶35 The State argues that the trial court did not have authority to hear Clarke's discovery motions because she failed to conduct the required CR 26(i) prefiling conference.

¶36 The purpose of CR 26(i) is to facilitate non-judicial solutions to discovery problems by requiring the parties to conduct a conference before attempting to obtain a court order. *Case v. Dundom*, 115 Wn. App. 199, 203, 58 P.3d 919 (2002).

¶37 Generally, we review a court's decision regarding noncompliance with court orders for abuse of discretion. *Dundom*, 115 Wn. App. at 201. But if the court does not have the discretion to hear a particular matter and its decision is based on a matter of law, then we conduct de novo review. *Dundom*, 115 Wn. App. at 201. " 'A trial court's

---

[6] But the request to schedule a deposition, i.e., new discovery, was not timely because it occurred after the discovery deadline.

authority to entertain a motion, as opposed to its authority to decide that motion, is a question of law.' " *Dundom*, 115 Wn. App. at 201 (quoting *Rudolph v. Empirical Research Sys., Inc.*, 107 Wn. App. 861, 866, 28 P.3d 813 (2001)).

¶38 In *Dundom*, we ruled that CR 26(i) requires literal compliance and that the trial court lacks the authority to hear a motion to compel when the parties do not certify that they have complied with the conference requirements. 115 Wn. App. at 203. We did not specify what "certification" required, but we stated that a conference had to be a contemporaneous two-way communication. *Dundom*, 115 Wn. App. at 203-04.

¶39 Here, Clarke sought to certify that she complied with the conference requirement when, in support of her April 14 motion to compel, her attorney stated: "After a discovery conference with [the State's attorney], the only issues outstanding were the answers to the following interrogatories [45 and 46] and the deposition of Christine Gregoire." CP at 742. The State's attorney agreed that he and Clarke's attorney had a telephone conversation on March 25, 2005, about the motion Clarke had filed to compel answers to interrogatories 45 and 46.[7] On March 31, the attorneys spoke again, and during this conversation the State informed Clarke's attorney that the State had compiled the information and that it was available for Clarke's review in the Seattle AGO, which was near Clarke's attorney's office.

¶40 The attorneys agreed on a specific time for Clarke's attorney to come to the AGO to review the material. Thereafter, Clarke failed to retrieve the information and, instead, without a further CR 26(i) conference to discuss any remaining discovery issues, filed the motion to compel.

¶41 Further, it is not clear when, if ever, the parties discussed or resolved the issue of the governor's deposition.

---

[7] This was the first motion to compel that Clarke filed. She agreed to strike this motion to compel after the State agreed to answer the interrogatories.

¶42 Under these circumstances, we cannot construe the March 31 telephone discussion between the attorneys relating to the State's interrogatory answers as a conference satisfying CR 26(i) for either issue. Thus, the trial court did not have authority to hear Clarke's motions to compel.

c. Motion To Compel Governor's Deposition

¶43 Clarke argues that her discovery motion was timely, that the court had authority to consider her motion because the CR 26(i) requirements had been met, and that the court should have compelled Governor Gregoire's deposition. Although we hold that her motion was not timely and that the trial court did not have authority to hear it, we briefly address her claim that she could compel the governor's deposition.

¶44 Clarke contends that the governor, who was the State's attorney general at the time of Clarke's employment and discipline, possessed relevant firsthand knowledge that was not available from other persons. And she asserts that the governor's testimony would have been relevant because the governor was responsible for: (1) developing defenses in discrimination cases; (2) hiring, termination, and promotion of employees; and (3) properly managing the AGO, which represents taxpayers.

¶45 The State relies on multiple federal rulings that conclude that high-level government officers are protected from deposition in most instances. For example, in *In re United States (Reno)*, the Eighth Circuit Court of Appeals cites to the United States Supreme Court and other federal courts and states: " '[h]igh ranking government officials have greater duties and time constraints than other witnesses . . . [they] should not, absent extraordinary circumstances, be called to testify regarding their reasons for taking official actions.' " 197 F.3d 310, 313 (8th Cir. 1999) (alterations in original) (internal quotation marks omitted) (quoting *In re United States*, 985 F.2d 510, 512 (11th Cir. 1993)). And if other persons can provide the information sought, the court should not allow discovery against the official. *Reno*, 197 F.3d at 314.

¶46 Here, no one contests that the governor was a high-ranking official (both as governor and attorney general). Further, the record does not indicate that she had any personal knowledge about Clarke, Clarke's termination, or the incidents surrounding the termination. Nor did she directly manage the Tacoma AGO. Thus, not only was the information available from other people, those people were the better source of the firsthand, relevant information.

¶47 We agree with the federal cases that protect high-ranking government officials from discovery when other available witnesses can provide the same information, and we hold that the trial court did not err when it substantively denied Clarke's motion to compel the governor's deposition.

d. State's Response to Interrogatories 45 and 46

¶48 The State argues that it adequately responded to interrogatories 45 and 46. Our review of the record supports the State's position.

¶49 Clarke requested the information under 41 C.F.R. § 60-3.4, which requires certain employers to maintain records that disclose the impact of employment decisions on people by identifiable race, sex, or ethnic group. The State does not dispute that the regulation applies to it, nor does it state that it did not keep required records. Rather, it states that it did not keep the records solely for purposes of the federal regulation.

¶50 The State generated a list of its classified employees that specified the age, ethnicity, and gender of each classified employee in the AGO. It compiled a similar list for the Tacoma AGO. And it provided a copy of its affirmative action and equal opportunity plan describing the State's hiring practices. That plan and the lists showed the result or impact of the State's practices.

¶51 It is unclear what more Clarke sought. Clarke does not explain why her attorney did not keep his appointment to review the State's response to interrogatories 45 and 46.

Rather she argues that it was not her responsibility to "find the information hidden [in] the mass of personnel records they were willing to produce." Reply Br. of Appellant at 8. But nothing in the record indicates that the State did less than compile the information Clarke sought.

e. Relevance to Summary Judgment Issues

¶52 Finally, the State argues that the information the State provided, which Clarke refused to look at and then sought to compel, was not probative of any of her pleaded causes of action. It argues that the information Clarke sought in interrogatories 45 and 46 was related to disparate impact based on a Title VII[8] claim that Clarke did not and could not successfully plead. Furthermore, the State asserts that even if Clarke could argue a theory of disparate impact, her claims against the State dealt solely with disparate treatment.

¶53 The State is correct that the information that Clarke sought dealt specifically with disparate impact, but it is not correct that Clarke was precluded from bringing such a claim under chapter 49.60 RCW. A claim under chapter 49.60 RCW can be brought under one of two theories: disparate impact or disparate treatment. *Oliver v. Pac. Nw. Bell Tel. Co.*, 106 Wn.2d 675, 678, 724 P.2d 1003 (1986).

¶54 A claim for disparate impact addresses facially neutral employment practices that fall more harshly on one group than another and that cannot be justified by business necessity. *Fahn v. Cowlitz County*, 93 Wn.2d 368, 379, 610 P.2d 857 (1980) (height requirements for hiring purposes have disproportionately unfavorable impact on certain protected classes). To establish a prima facie case of disparate impact, the plaintiff must prove (1) a facially neutral employment practice that (2) falls more harshly on a protected class. *Oliver*, 106 Wn.2d at 679.

---

[8] 42 U.S.C. § 2000(e).

¶55 The State is correct that Clarke's complaint asserts disparate treatment, not disparate impact. Clarke alleges that the State discriminated against her because of her race, ethnicity, and national origin. She claims that she was not promoted or offered career growth and that she was pushed out of her position. These claims deal with the State's specific treatment of Clarke. Her claims do not suggest or point to a policy or regulation that disparately impacts a protected class. Thus, the information she sought was not relevant evidence of the State's specific treatment of Clarke and the State is correct that it would not have defeated summary judgment in favor of the State.

¶56 The trial court did not err in refusing to compel further answers by the State to interrogatories 45 and 46.[9]

## B. Summary Judgment

### 1. Standard of Review

¶57 Clarke argues that her hostile work environment claim and her discrimination claim should have survived summary judgment. We disagree.

¶58 When reviewing an order of summary judgment, we engage in the same inquiry as the trial court. *Grundy v. Thurston County*, 155 Wn.2d 1, 6, 117 P.3d 1089 (2005). Summary judgment is appropriate only if the pleadings, affidavits, depositions, and admissions on file demon-

---

[9] Because Clarke believes that she was entitled to more information than she says the State produced, Clarke also argues that we should presume discrimination by the State. She cites to the spoliation of evidence rule.

"Spoliation is the 'intentional destruction of evidence.'" *Marshall v. Bally's Pacwest, Inc.*, 94 Wn. App. 372, 381, 972 P.2d 475 (1999) (quoting BLACK'S LAW DICTIONARY 1401 (6th ed. 1990)). Where relevant evidence that would properly be a part of a case is within the control of a party whose interests it would naturally be to produce it and the party fails to do so without satisfactory explanation, the only inference the fact finder may draw is that the evidence would be unfavorable to that party. *Marshall*, 94 Wn. App. at 381 (quoting *Pier 67, Inc. v. King County*, 89 Wn.2d 379, 573 P.2d 2 (1977)). To remedy spoliation the court may apply a rebuttable presumption, which shifts the burden of proof to a party who destroys or alters important evidence. *Marshall*, 94 Wn. App. at 381.

Clarke, however, ignores that fact that the State did provide the information she sought in interrogatories 45 and 46 and she failed to look at or evaluate it. Thus, the spoliation rule does not apply.

strate the absence of any genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c). The court must consider all facts submitted and all reasonable inferences from them in the light most favorable to the nonmoving party. *Grundy*, 155 Wn.2d at 6. The court should grant the motion only if, from all the evidence, reasonable persons could reach but one conclusion. *Lilly v. Lynch*, 88 Wn. App. 306, 312, 945 P.2d 727 (1997).

## 2. Hostile Work Environment

¶59 Clarke argues that the court erred when it dismissed her claim for hostile work environment because the State harassed her when it (1) manufactured accusations against her and (2) physically assaulted her (Binger's turning Clarke's chair around).

¶60 To establish a claim for a hostile work environment, a plaintiff must file the claim within the applicable statute of limitations and must prove that harassment (1) was unwelcome, (2) was because she is a member of a protected class, (3) affected the terms and conditions of her employment, and (4) was imputable to her employer. *Domingo v. Boeing Employees' Credit Union*, 124 Wn. App. 71, 84, 98 P.3d 1222 (2004). To satisfy the third element, the harassment must be sufficiently pervasive so as to alter her employment conditions. *Washington v. Boeing Co.*, 105 Wn. App. 1, 10, 19 P.3d 1041 (2000). It is not sufficient that the conduct is merely offensive. *Adams v. Able Bldg. Supply, Inc.*, 114 Wn. App. 291, 296, 57 P.3d 280 (2002).

¶61 Discrimination claims must be brought within three years to satisfy the statute of limitations. *Antonius v. King County*, 153 Wn.2d 256, 261, 103 P.3d 729 (2004). Our Supreme Court in *Antonius* adopted the United States Supreme Court's analysis in *National Railroad Passenger Corp. v. Morgan*[10] to determine whether an employer is liable for hostile work environment conduct that occurred

[10] 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).

more than three years before the plaintiff filed suit. 153 Wn.2d at 258. The court held that hostile work claims can occur over a series of days or years and generally are not single, discrete acts. *Antonius*, 153 Wn.2d at 264 (citing *Morgan*, 536 U.S. at 115). It held that " '[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.' " *Antonius*, 153 Wn.2d at 264 (alteration in original) (quoting *Morgan*, 536 U.S. at 117).

¶62 Here, Clarke's last day of work at the Tacoma AGO was January 24, 2001, when she was reassigned to home. She filed her hostile work environment claim on March 16, 2004, and her additional claims on May 19, 2004. Clarke argues that her reassignment to home constituted a hostile work environment because it was "the moral equivalent of being sent to Siberia." Reply Br. of Appellant at 19. And she argues that the final act showing a hostile work environment was her March 21, 2001 termination.

¶63 But Clarke could not have been subjected to a hostile work environment if she was not at work. Thus, we consider that the final day when any alleged hostility could have occurred was January 24, 2001. The statute of limitations on this claim ran in January 2004, and Clarke's hostile work environment claim was timebarred.

¶64 Furthermore, when we examine the substance of her hostile environment claim, we hold that it fails.

¶65 Clarke asserts that the State's accusation that she tampered with a witness and Binger's act of swinging Clarke's chair around to face her in 1999 were sufficient evidence of a hostile work environment.[11] In addition,

---

[11] Besides being barred by the statute of limitations, the alleged physical abuse was not pervasive enough to affect the terms and conditions of Clarke's employment. Binger's act was an isolated offensive incident, but offensive conduct is not enough to illustrate hostility. *Adams*, 114 Wn. App. at 296-97; *see also Washington*, 105 Wn. App. at 13 ("Referring to Washington's hair as 'brillo head,' while highly offensive, was an isolated incident and not sufficiently pervasive to alter the conditions of her employment.").

Clarke argues that the accusation of witness tampering should not have been considered because it was based on hearsay and that she was falsely accused along with her friend, who was also a member of a protected class.[12]

¶66 Conduct that supports a valid hostile work environment claim must be so pervasive as to alter the terms and conditions of employment and create an abusive working environment. We must look at the totality of the circumstances and at whether the conduct involved words alone or also included physical conduct. *Adams*, 114 Wn. App. at 296-97. The conduct must be both objectively abusive and subjectively perceived as abusive by the victim. *Adams*, 114 Wn. App. at 297.

¶67 In *Adams*, Division Three of this court evaluated whether an employer's frequent vocal and physical outbursts constituted a hostile work environment based on Adams' gender. 114 Wn. App. at 295-96. The court held that the conduct was sufficient to constitute a question of fact about whether Adams' employment conditions were affected. *Adams*, 114 Wn. App. at 297. But in order for the fact to be material, Adams had to demonstrate that the conduct was based on her gender. *Adams*, 114 Wn. App. at 297. In other words, Adams had to show that the conduct was directed at women and motivated by animus toward women. *Adams*, 114 Wn. App. at 297.

¶68 Here, Clarke does not show that implementing disciplinary procedures based on an accusation of witness tampering was either (1) objectively abusive or (2) directed at her because of her race. She offered no evidence showing that if any other employee had the same charge brought against him that the State would not have taken the same disciplinary actions.

---

[12] Hearsay is an out-of-court statement offered for the truth of the matter asserted. ER 801(c). But the State did not rely on the hearsay statements to prove that Clarke tampered with a witness. Rather, it relied on them to support its decision to implement disciplinary procedures against Clarke. Thus, the statements were not offered for the truth of the matter asserted and the court could consider them.

¶69 The trial court properly granted summary judgment to the State on Clarke's hostile work environment claim.

Discrimination Claim

¶70 Clarke argues that the court erred in dismissing her discrimination claim against the State due to (1) "the adverse impact of its personnel selection procedures" and (2) the spoliation of evidence rule.[13] Br. of Appellant at 21. She argues that she was the victim of disparate impact[14] and disparate treatment because of her race.

¶71 The plaintiff has the initial burden of establishing a prima facie case of employment discrimination. *Domingo*, 124 Wn. App. at 77. Once the plaintiff establishes a prima facie case, an inference of discrimination arises and the defendant must present evidence that the plaintiff was terminated for legitimate reasons. *Domingo*, 124 Wn. App. at 77. The plaintiff must then show that the proffered reason is a pretext for discrimination. *Domingo*, 124 Wn. App. at 77. The plaintiff has the final burden of persuading the trier of fact that discrimination was the substantial factor in the termination decision. *Domingo*, 124 Wn. App. at 77; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

¶72 If the plaintiff cannot establish the material facts to support each element of the prima facie case, the defendant is entitled to judgment as a matter of law. *Domingo*, 124 Wn. App. at 77-78. Summary judgment is also proper where the plaintiff cannot present evidence that the defendant's reasons for terminating the plaintiff were untrue or mere pretext or if no rational trier of fact could conclude that the termination was discriminatory. *Domingo*, 124 Wn. App. at 78.

¶73 In order to establish a prima facie case for a claim of disparate treatment, a petitioner must show that she (1) is

---

[13] See above for discussion on spoliation.

[14] See above for discussion on disparate impact.

a member of a protected class, (2) was treated less favorably than a similarly situated nonprotected employee, and (3) the nonprotected employee was doing the same work. *Domingo*, 124 Wn. App. at 81.

¶74 Clarke is a member of a protected class. But she presented no evidence of disparate treatment. For example, she offered no evidence that (1) the State failed to take similar disciplinary action against a nonprotected coworker suspected of witness tampering, (2) the State failed to take disciplinary action against a nonprotected coworker who failed to distribute mail for three months, or (3) a similarly situated nonprotected coworker was offered greater opportunities to advance. Thus, Clarke did not establish a prima facie case and we do not proceed to further analyze her disparate treatment claim and the State's defenses to it.

¶75 The trial court did not err when it granted summary judgment to the State on Clarke's hostile work environment and disparate treatment claims.

¶76 We affirm.

QUINN-BRINTNALL, C.J., and HUNT, J., concur.

Review denied at 160 Wn.2d 1006 (2007).