272 P.3d 249 (2011)
167 Wn. App. 28
LAKE CHELAN SHORES HOMEOWNERS ASSOCIATION, a Washington non-profit entity, Appellant,
v.
ST. PAUL FIRE & MARINE INSURANCE COMPANY, a foreign corporation, Respondent, and
Northern Insurance Company of New York, a foreign corporation, Defendant.
No. 66636-3-I.
Court of Appeals of Washington, Division 1.
November 28, 2011.
Publication Ordered March 12, 2012.
*250 John T. Petrie, Robert J. Curran, Susan R. Fox, Ryan Swanson & Cleveland, Seattle, WA, for Appellant.
Phillip J. Skuda, James T. Derrig, Seattle, WA, for Respondent.
SPEARMAN, J.
¶ 1 The main issue in this insurance coverage case is whether the method by which expert witnesses for Lake Chelan Shores condominiums homeowners association ("LCS") established that "collapse" conditions occurred years earlier was generally accepted within the scientific community. In its summary judgment motion, St. Paul Fire & Marine Insurance Company ("St. Paul") set forth evidence indicating the methodology of LCS's experts was not generally accepted. The burden then shifted to LCS to come forward with evidence the methodology was generally accepted. Because LCS provided no such evidence, the trial court properly concluded there was no admissible evidence of "collapse," a prerequisite for coverage under the policy. We affirm.

FACTS
¶ 2 St. Paul insured the premises of LCS under three annual policies, effective from August 3, 1996 to August 3, 1999. Each of *251 those policies provided coverage for "collapse" that occurred during the policy period:
Collapse coverage. We'll insure covered property against the risk of direct physical loss or damage involving collapse of a building or any part of a building.
¶ 3 The collapse must be due to any of the following causes of loss:
...
 hidden decay;
The policies contained the following relevant exclusions from coverage:
ExclusionsLosses We Won't Cover
...
Collapse. We won't cover loss resulting from collapse other than that described in the collapse coverage under the Covered Causes Of Loss section.
...
Wearteardeteriorationanimals.
We won't cover loss caused or made worse by:
 wear and tear;
 deterioration, mold, wet or dry rot, rust or corrosion including fungal or bacterial contamination; ...
¶ 4 The LCS condominiums were built between 1980 and 1994. LCS first discovered a problem with rot in mid-2006. LCS hired Olympic Associates, an architectural and engineering firm, to inspect and report on the problem. By April 2007, LCS had decided to contract for a repair project that would include removal and replacement of all siding. On July 11, 2007, LCS adopted a resolution for financing the project, and on July 27, 2007, it submitted design documents to the City of Chelan Building Department.
¶ 5 LCS tendered its claim to St. Paul on July 5, 2007. On July 23, a St. Paul property adjuster contacted counsel for LCS, and on July 26, the adjuster sent a letter to counsel asking for documents relating to the loss. Counsel for LCS did not respond to the request. On August 27, counsel for LSC sent a letter to St. Paul requesting reimbursement for $303,424 in investigation costs. Three days later, on August 30, 2007, LCS sued St. Paul for breach of contract, bad faith, and Consumer Protection Act (CPA) violations.
¶ 6 In July 2009, LCS disclosed its experts' opinions. On the basis of these opinions, St. Paul denied the claim and moved for partial summary judgment as to coverage. St. Paul argued there was no coverage, because LCS's experts had no generally accepted scientific basis on which to link the current building decay to a state of "collapse" during the St. Paul policy periods. In the alternative, St. Paul asked for a Frye[1] hearing on LCS's experts' methods. The trial court agreed with St. Paul, and granted the motion.
¶ 7 LCS then moved to compel discovery as to its remaining extra-contractual claims. St. Paul moved for summary judgment on the extra-contractual claims. LCS sought a CR 56(f) continuance. The trial court denied LCS's motion, and granted St. Paul's motion for summary judgment, dismissing the rest of the claims. LCS appeals.

DISCUSSION

Summary Judgment on Coverage Claims
¶ 8 The trial court granted St. Paul's motion for summary judgment on coverage. The court agreed that the opinions of LCS's experts that the condominiums were in "collapse" 10 years earlier was not based on any theory generally accepted in the scientific community. The trial court thus found LCS had failed to present evidence of coverage, and it granted the motion. For the reasons described herein, we agree with the trial court.
¶ 9 LCS offers multiple arguments as to why this was error, but those arguments rest upon two main, interconnected premises: (1) conflicting opinion testimony offered by opposing experts cannot be resolved at summary judgment and (2) the trial court essentially weighed evidence as if it was presiding over a Frye hearing as opposed to a summary judgment hearing. LCS is correct that disputed opinion testimony, offered by qualified experts, cannot be resolved at summary judgment. See Postema v. Pollution Control *252 Hearings Bd., 142 Wash.2d 68, 119-20, 11 P.3d 726 (2000). In its brief, LCS provides a list comparing and contrasting the expert deposition and declaration testimony of its experts versus St. Paul's expert.
¶ 10 But LCS misunderstands the nature of St. Paul's motion and the trial court's ruling. St. Paul's motion for partial summary judgment argued the undisputed evidence gathered during discovery showed that the scientific bases upon which the opinions of LCS's experts rested were not generally accepted within the scientific community. The motion also requested a Frye hearing in the event the court determined there was disputed evidence on the issue.
¶ 11 For expert testimony to be admissible, it first must satisfy the Frye standard and then must meet the other criteria in ER 702. See State v. Gregory, 158 Wash.2d 759, 829-30, 147 P.3d 1201 (2006). Under Frye, expert testimony is admissible where:
(1) the scientific theory or principle upon which the evidence is based has gained general acceptance in the relevant scientific community of which it is a part; and (2) there are generally accepted methods of applying the theory or principle in a manner capable of producing reliable results.
State v. Sipin, 130 Wash.App. 403, 414, 123 P.3d 862 (2005). Both the theory underlying the evidence and the methodology used to implement the theory must be generally accepted in the scientific community for evidence to be admissible under Frye. Gregory, 158 Wash.2d at 829, 147 P.3d 1201. When applying the Frye test, courts do not determine if the scientific theory underlying the proposed testimony is correct; rather, courts "must look to see whether the theory has achieved general acceptance in the appropriate scientific community." Grant v. Boccia, 133 Wash.App. 176, 179, 137 P.3d 20 (2006) (quoting State v. Riker, 123 Wash.2d 351, 359-60, 869 P.2d 43 (1994)). To perform a Frye analysis, courts consider three sources of information:
To determine whether a consensus of scientific opinion has been achieved, the reviewing court examines expert testimony, scientific writings that have been subject to peer review and publication, secondary legal sources, and legal authority from other jurisdictions. However, "the relevant inquiry is general acceptance by the scientists, not the courts."
Eakins v. Huber, 154 Wash.App. 592, 599-600, 225 P.3d 1041 (2010) (citations omitted).
¶ 12 In its motion, St. Paul set forth what it believed showed a lack of general acceptance. The only evidence purporting to show a state of collapse from hidden decay during the St. Paul policy periods came in the form of two opinions from LCS's experts. One of the experts, Justin Franklin, was a civil engineer at Olympic Associates. Regarding whether it was possible to backdate from the present rot condition to the initial onset of a state of collapse, Franklin sent an email in 2006 saying it could not be determined:
We did an investigation on a building in Chelan which has lots of rotten framing. The attorney for the HOA would like to know if we can estimate when the rot occurred. Apparently their insurance coverage ended in 2002 and of course he would like us to state the rot was present in 2002. I told him that all we can say is that the rot presently exists but that we can not [sic] state when the rot and subsequent SSI occurred.
At his 2009 deposition, however, he claimed to be able to trace the progression of decay at the LCS properties with only two pieces of information: (1) the date each building was built and (2) the depth of the rot when it was uncovered during remediation in 2007-2009. He applied a formula, y = ax2 + c, to trace the progression of rot between these two times. The formula means that the percentage of decay "y," progresses according to the square of the number of years "x," times a decay rate "a," plus a constant "c." The constant "c" allows for a time lag between completion of construction and the start of decay, which Franklin assumed to be one year.
¶ 13 Franklin then applied the formula y = ax2 + 1 to every area in which Olympic Associates had identified a collapse condition during its 2007-2009 inspection. This application resulted in a series of curves purporting *253 to plot the progression of rot at each location from the time of construction to the time the rot was discovered by Olympic Associates. Franklin assigned a "collapse" point at the first point the rot reached a collapse condition, and then compared that date to policy periods.
¶ 14 Franklin's equation did not come from any scientific literature. Instead, he got it from another Olympic Associates engineer, Lee Dunham. When asked, "[w]hat work has Mr. Dunham done to verify the accuracy of that equation that you know of?", Franklin testified, "I don't know." Franklin also testified that the engineers at Olympic Associates simply assumed decay began one year after construction was complete. He did not testify that the assumption was generally accepted in the scientific community. Franklin described his calculations as "educated guesses" and was unable to identify any other person or literature stating his formula is a proper equation for estimating rot progression.
¶ 15 LCS's second expert was Kevin Flynn, a wood scientist from California. Flynn could not identify any support in the scientific community for the proposition that decay advances according to the square of the number of years as is set forth in Franklin's equation. LCS hired Flynn because it claimed Flynn's use of a software package called "TimberLife" validated Franklin's equation. But neither Flynn nor any other witness testified that it was generally accepted in the scientific community to use Timber-Life to determine or confirm when a state of collapse began by working backward from present rot conditions. Instead, Flynn testified that TimberLife is a design tool intended to guide building designers in selecting appropriate building materials. It is not forensic software that predicts timber life values with precision.
¶ 16 In its response to the summary judgment motion, LCS did not dispute any of this information about the scientific bases for the expert opinions. Instead, the response simply repeated the opinions and noted that LCS's experts "rely upon long accepted scientific knowledge and their own education, training and experience" in providing the opinions. LCS had Franklin submit a declaration (with numerous exhibits), the bulk of which was spent explaining how his formula works and providing examples of the back dating. The only part of Franklin's declaration that came close to addressing whether his formula was generally accepted within the scientific community was the following paragraph:
This is a formula defining an exponential curve which approximates my observations, and those of other engineers in the field. Thus, this formula is merely an equation for graphing the wood rot's lag phase and accelerated growth phase that is universally accepted in the scientific community. Equations such as this are commonly used by engineers and others for various applications.
This paragraph states only that it is generally accepted in the scientific community that rot has a lag phase and an accelerated growth phase; it says nothing about whether the formula is generally accepted within the scientific community as a method of back dating when rot has progressed to the point of collapse.
¶ 17 Likewise, the vast bulk of Flynn's declaration is spent discussing his background, the validity of Franklin's data, and the possible confirmation of that data by the TimberLife software. Only one paragraph appears to discuss the merits of St. Paul's allegations regarding the general acceptance of Franklin's formula:
Thus, while no single mathematical model has been accepted to the exclusion of others, the concept of applying a mathematical model such as Mr. Franklin's to approximate the exponential curve that describes the progress of wood decay is generally accepted in the scientific community.
At most, this paragraph simply states that models approximating exponential curves that describe wood decay are generally accepted, but it does not address the critical issue: whether the use of such formulas, and in particular, Franklin's formula, to back date to the time when the collapse condition began, is generally accepted in the scientific community.
*254 ¶ 18 LCS is correct that in general, the moving party on summary judgment bears the initial burden of showing the absence of an issue of material fact. Young v. Key Pharm., Inc., 112 Wash.2d 216, 225, 770 P.2d 182 (1989). However, where a plaintiff "`fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,'" the trial court should grant the motion. Id. at 225, 770 P.2d 182 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). A moving defendant may meet the initial burden by "`showing' that is, pointing out to the [trial] courtthat there is an absence of evidence to support the nonmoving party's case." Young, 112 Wash.2d at 225 n. 1, 770 P.2d 182, (quoting Celotex, 477 U.S. at 325, 106 S.Ct. 2548). That is exactly what happened here: St. Paul pointed to an absence of evidence that the bases of the opinions offered by LCS's experts were generally accepted and LCS failed to respond. In light of this unrebutted evidence, the trial court did not err in concluding that the opinions were inadmissible and that LCS could not prove a collapse condition existed during the coverage period. Accordingly, the trial court properly granted St. Paul's summary judgment motion.

Summary Judgment on Extra-Contractual Claims
¶ 19 LCS next argues the trial court erroneously granted St. Paul's motion for summary judgment on its extra-contractual claims, namely the claims for bad faith and CPA violations arising from the alleged failure to adequately investigate, both under a common law duty to investigate and a Washington Administrative Code-imposed duty to investigate. We reject LCS's arguments.
¶ 20 Generally, "[a]n insurer must make a good faith investigation of the facts supporting a claim and may not deny coverage if a reasonable investigation would have proved the insurer's defense to be without merit." Capelouto v. Valley Forge Ins. Co., 98 Wash.App. 7, 19-20, 990 P.2d 414 (1999) (citing Industrial Indem. Co. v. Kallevig, 114 Wash.2d 907, 917, 792 P.2d 520 (1990)). LCS contends that because St. Paul did not undertake its own investigation of the rot, i.e., by removing the exterior cladding on the condominiums to try to determine when the "collapse" occurred, LCS was forced to "incur the full cost of stripping and recladding all 21 buildings at Lake Chelan Shores." We disagree.
¶ 21 As is described above, the method by which LCS claims St. Paul should have attempted to determine the date of "collapse" a decade earlier was not generally accepted in the scientific community. It is difficult to say the trial court erred in concluding such an investigation would not have been "reasonable." Capelouto, 98 Wash.App. at 19, 990 P.2d 414. Moreover, any costs LCS incurred in recladding the buildings was not proximately caused by any alleged failure to investigate by St. Paul. Panag v. Farmers Ins. Co. of Washington, 166 Wash.2d 27, 64, 204 P.3d 885 (2009) § "If the investigative expense would have been incurred regardless of whether a violation existed, causation cannot be established" (citing Sambor v. Omnia Credit Servs., Inc., 183 F.Supp.2d 1234 (D.Haw.2002)). Indeed, it is undisputed that LCS had decided to contract for a repair project that would include removal and replacement of all siding by April 2007, about three months before LCS even tendered to St. Paul. The trial court thus properly dismissed LCS's extra-contractual claims.

Denial of Motions to Compel and Continue
¶ 22 LCS also contends the trial court abused its discretion by denying two motions: (1) a CR 56(f) continuance of St. Paul's summary judgment motion on the extra-contractual claims and (2) a motion to compel discovery regarding St. Paul's investigation of LCS's claims. We reject the arguments for the reasons described herein.
¶ 23 A trial court's denial of a motion to compel or a CR 56(f) motion for a continuance are reviewed for an abuse of discretion. See Clarke v. Office of Attorney General, 133 Wash.App. 767, 777, 138 P.3d 144 (2006); Mossman v. Rowley, 154 Wash. App. 735, 742, 229 P.3d 812 (2009). "A court abuses its discretion when it bases its decision *255 on unreasonable or untenable grounds." Clarke, 133 Wash.App. at 777, 138 P.3d 144 (quoting Brand v. Dep't of Labor & Indus., 139 Wash.2d 659, 665, 989 P.2d 1111 (1999)).
¶ 24 Here, the CR 56(f) motion sought a continuance of St. Paul's summary judgment motion on extra-contractual claims "until a reasonable date following St. Paul Fire & Marine's compliance with any order issued by this Court following hearing on the Plaintiff's Motion to Compel Discovery[.]" The motion to compel discovery sought: St. Paul's "subrogation file;" documents "relating to the investigation of this claim in an unredacted condition;" and supplemental responses to interrogatories about St. Paul's involvement in other claims regarding back timing of rot.
¶ 25 The motion to compel thus sought information relating to St. Paul's alleged deficient investigation. But as is described above, the method by which LCS claims St. Paul should have attempted to investigate was not generally accepted in the scientific community, and any costs LCS incurred in recladding the buildings was not proximately caused by an alleged failure to investigate by St. Paul. In short, the motion sought information not reasonably calculated to lead to admissible evidence, see CR 26(b)(1), and there was no need to continue the summary judgment hearing to obtain such information. As such, the trial court did not abuse its discretion by denying the motion to compel and the CR 56(f) motion for a continuance.
¶ 26 Affirmed.
WE CONCUR: DWYER, C.J., and SCHINDLER, J.
NOTES
[1] Frye v. United States, 293 F. 1013 (D.C.Cir. 1923).