[No. 35950-2-II. Division Two. November 12, 2008.]

AUDREY BROYLES ET AL., *Respondents*, v. THURSTON COUNTY, *Appellant*.

---

[6] Neither party requested attorney fees.

412

414

*Michael A. Patterson, Patricia K. Buchanan,* and *Karen A. Kalzer* (of *Patterson Buchanan Fobes Leitch & Kalzer, Inc.*), for appellant.

*Stephanie L. Bloomfield, J. Richard Creatura, James W. Beck, Andrea H. McNeely, Daniel T. Fasy,* and *Bryan D. Doran* (of *Gordon, Thomas, Honeywell, Malanca, Peterson & Dahiem, PLLC*), for respondents.

¶1 PENOYAR, A.C.J. — Thurston County (County) appeals from a jury verdict holding the County liable based on hostile work environment and retaliation claims. The County asserts that (1) it is not liable for the acts of the prosecuting attorney, Edward Holm; (2) the trial court erred in allowing evidence outside the statute of limitations, in not applying collateral estoppel, and in allowing marital discrimination evidence; (3) the trial court erred in not allowing evidence detailing a meeting in which the plaintiffs and another deputy prosecutor consulted an attorney; (4) the jury's verdict was excessive; and (5) the trial court abused its discretion in setting the plaintiffs' attorney fee award. We affirm.

## FACTS

### I. PLAINTIFFS' TESTIMONY

#### A. Broyles

¶2 Audrey Broyles began work as a deputy prosecuting attorney (DPA) for the Thurston County prosecutor in 1993. She served as a misdemeanor prosecutor, as the juvenile division supervisor, and, at the time Holm took office in January 1999, as the felony prosecutor in charge of domestic violence cases. Holm kept her in this felony prosecution

role but also made her the juvenile division supervisor. Later that same year, Holm assigned her the additional responsibility of screening all the misdemeanor domestic violence cases. In January 2000, Holm promoted her from a DPA III to a senior deputy, though she was placed in a lower pay scale range than other senior DPAs.

¶3 In November 2000, Broyles, Vonda Sargent, Susan Sackett-DanPullo, and Christy Peters met with Holm to voice their concerns about Phil Harju, their supervisor, and Jack Jones, a felony DPA. They asked Holm to remedy an "intolerable" situation that included Jack Jones's "demeaning and volatile behavior" and concerns for their safety. Report of Proceedings (RP) at 99-100. They described Phil Harju's unwillingness to control Jones, his "disparate treatment of the women," and his repeated references to others about Broyles having a "special relationship" with Holm. RP at 100. Broyles explained that Holm expressed concern and that he told the women this was an office culture that would take time to remedy and things would probably get worse before they got better.

¶4 After this meeting with Holm, Peggy Quan, the county human resources director, met with each of the women and with other DPAs. During trial, Broyles explained what she was feeling at the time:

> It made it very difficult and very demeaning to have other individuals in the office think that I was in the position that I was because I was having a sexual relationship with my boss. It was extremely demeaning and humiliating to me. I felt that once Ed knew about the concern that that was the rumor that was being perpetrated in the office, that he could take some action to correct that, and he did not. It was very humiliating for me to think that I was looked at as someone who was getting special treatment, or perceived special treatment because of a relationship instead of based on my merits as an attorney.

RP at 108-09. Even though Quan said that she would get back to Broyles after her investigation, she did not. Broyles explained that the atmosphere in the office got much worse

after the meeting and that she and the other women had to endure cold-shouldering, nonresponsiveness, snide remarks, and lack of communication from five male DPAs.

¶5 In December 2000, because the atmosphere in the office continued to deteriorate, the four women sought legal advice. They did not retain the attorneys at that point but waited to see if matters would improve. Matters did not improve, and at one staff meeting, Holm even commented that "we also have to deal with this woman issue." RP at 114.

¶6 In early 2001, Holm asked Broyles to develop a new domestic violence unit that would handle both misdemeanors and felonies. This change involved extensive coordination between the courts, the public defender's office, the sheriff's office, and assigning four DPAs to handle the case load. Broyles had a target date of July 1, 2001. Broyles encountered resistance to the change from Mark Thompson, the DPA in charge of the misdemeanor unit. Just as her new unit was getting started, Thompson and James Powers obtained Holm's permission to take two of her DPAs to cover the misdemeanor division. After a volatile discussion with Holm about him not supporting her efforts, Broyles found herself crying, hyperventilating, very emotional, and distraught. She then left the office, sought medical care, and followed her doctor's advice to take medical leave from work. In August, the plaintiffs filed their notice of claim against the County.

¶7 Broyles returned to work on September 17, 2001, as the supervising attorney in the juvenile division. She described the situation in the office as worse and said that she had to endure comments from Holm that she was a queen bee and building her empire. She also described his commenting on women's breasts and other anatomy.

¶8 On December 31, 2001, Holm terminated Broyles. Believing that she had been fired in retaliation for her hostile work environment claim, Broyles asked the county council to reinstate her. The council granted her request, reinstated her pay back to her termination date, and

continued to pay her until she relocated to Oregon in May 2004, even though Holm refused to allow her to work for him.

## B. Sargent

¶9 Vonda Sargent began working for the Thurston County prosecutor in 1997. Before Holm took office in January 1999, she prosecuted misdemeanors and gross misdemeanors in district court. During that time, she was promoted from a DPA I to a DPA II. Shortly after Holm took office, he moved Sargent from the misdemeanor division to the felony division to handle the felony preliminary appearance and the noncompliance calendars. In late January or early February 2000, Holm asked Sargent to join Broyles on the domestic violence unit. Sargent did not want this transfer and told Holm this, but changed her mind after Harju and Thompson told her she really had no choice. When Sargent had difficulties with Jack Jones, she went to Harju, who was her supervisor. He told her to "just let it go . . . let Jack calm down . . . let it go and let it all die -- die down." RP at 500.

¶10 During June or July, Sargent began sharing her experiences in the office with Broyles, Peters, and Sackett-DanPullo. This was necessary, she felt, because the office situation was "unbearable," "uncomfortable," and "frightening." RP at 505. Sargent described the office atmosphere as getting more hostile as time progressed. She described how difficult it was to get someone to cover for her, the lack of communication in the office, and being subject to heightened scrutiny.

¶11 When the four women DPAs met with Holm in the previously described meeting in November 2000, Sargent said they all related their concerns about sexualized behavior, hostility, and not getting the same advancement opportunities as men. At Holm's request, she too met with Peggy Quan and, though Quan noted Sargent's concerns, Quan never got back to her or did anything as a result of the meeting.

¶12 According to Sargent, after the meeting with Holm, the atmosphere in the office became "like walking into enemy camp every morning." RP at 530. Sargent described feeling alone because Holm had moved Sackett-DanPullo to Lacey and had moved both Broyles and Peters to the juvenile building.

¶13 Regarding the January 2001 reorganization, Sargent explained that she found that it did not remedy the women's concerns but, to the contrary, promoted the men and shuffled the women out of the main office. One consequence of Broyles's taking medical leave was that Sargent was then assigned misdemeanors and Harju took her felony cases. As to whether the reorganization changed Harju's supervisory role, she testified:

> Phil Harju, even with that organizational chart, continued to hold himself out as my supervisor in a number of ways, including demanding how I enter and exit the office, demanding to know where I was going and when I was going to be back, demanding to know -- demanding that I go to him directly if I needed any leave. So that's why I say that it's just on paper.

RP at 542. She complained to Holm about the reassignment after Broyles took medical leave. His response was that "he could send me back to misdemeanor with the rest of the girls." RP at 544.

¶14 In September or October, Sargent left the prosecutor's office for a job at State Farm. She explained why:

> I couldn't take it anymore. I had -- I -- I couldn't give any more. I had been put back in the misdemeanor division, just like Mr. Holm promised me that he would. I was assigned a misdemeanor caseload, just like he promised me that he would. There was no future for me there.

RP at 551.

C. Sackett-DanPullo

¶15 Susan Sackett-DanPullo began working for the Thurston County prosecutor in February 1995. She began

with felony preliminary appearances and then moved into misdemeanors. In January 1996, she moved to the juvenile division under Broyles's supervision. After about a year, she moved back to the misdemeanor division as a supervisor. Then, in 1998, she moved back to the juvenile division as a supervisor when Broyles was assigned to the felony division.

¶16 When Holm took office, he wanted Sackett-DanPullo to spend more time doing trial work, so he relieved her of her supervisory responsibilities. In July 1999, she became the lead DPA for the juvenile division as Broyles's focus changed to domestic violence.

¶17 In July 2000, there was an opening in the general felony unit and Sackett-DanPullo expressed her interest in the position to Holm. At first Holm was supportive but later told her that he would rather she worked in community prosecution. When she told him she was not interested in that position because she wanted to do trial work, Holm responded, "you'll be great for it. You're -- you know, you live out in Lacey, which is where they thought it would be. And your husband's black, it's a great fit for you." RP at 1377.

¶18 In November 2000, Sackett-DanPullo attended the meeting between the four female DPAs and Holm. Her concerns involved the demeaning conduct occurring in the general felony meetings, which she described as run like a good old boys club; Harju's lack of leadership and suggestion that Broyles had a special relationship with Holm; Jones's bullying; and the discomfort she felt when speaking with Harju because he would continually stare at her breasts rather than looking her in the eyes.

¶19 Sackett-DanPullo too was dissatisfied with the January 2001 reorganization. Further, she had several incidents in which Holm described various women based on their breast size and whether they were good looking. He made sexualized comments to her, mentioning at one time that he could save expenses by sharing a room with a female Lacey police officer, whom he described as really good looking. With regard to a conference in Lacey, Holm said

that it was too bad Sacket DanPullo was sharing a room with another woman because otherwise he could come to her room until her husband got there.

¶20 Sackett-DanPullo testified that no one in the office would talk to her after the plaintiffs filed their tort claim. She described incidents where Jones engaged in inappropriate behavior toward her that, at one point, had her fearing for her own safety. She described the office as polarized and explained that her time sheets were unfairly scrutinized. After what she described as a volatile disagreement with Holm in early November 2001, over whether she could have someone present in a meeting he wanted to have with her, Sackett-DanPullo broke down, sought medical attention, and ended up on sick leave until January 4, 2002. RP at 1455-58. She returned to a very hostile office, where everyone had just learned that Holm had fired Broyles.

¶21 Holm also denied Sackett-DanPullo's request for a full-time felony position and insisted that she take a half-time community prosecution position and half-time felony position. In August 2002, she again went on medical leave.

¶22 Holm informed her in December 2002, after she returned from medical leave, that he would not be renewing her appointment. She described the effect this had on her:

> It was devastating. That's all I wanted to be. I never -- I was the first person in my family to go to school. I put myself through school. I wanted to make a better life for my daughter. And I felt like I was doing a service to people and -- giving back to the community, and working hard.
>
> . . . .
>
> I just felt like I shouldn't have to leave. That I'm not the one that created the problems and it shouldn't be me that has to leave. And that wasn't fair.

RP at 1469-70.

II. Procedural History

¶23 On January 11, 2002, the plaintiffs filed a lawsuit (*Broyles* I) in Thurston County Superior Court against four

defendants: Edward Holm, Phillip Harju, James Powers, and the Thurston County Office of the Prosecuting Attorney. The plaintiffs filed an amended complaint three weeks later, naming the three individual defendants and "THURSTON COUNTY; (THURSTON COUNTY OFFICE OF THE PROSECUTING ATTORNEY)." Clerk's Papers (CP) at 3969-70. All three plaintiffs alleged complaints for sex discrimination, hostile work environment, and retaliation. Sargent had an additional claim for race discrimination. Sackett-DanPullo had an additional claim for marital status discrimination.

¶24 In March 2003, the plaintiffs agreed to dismiss all claims against Powers without prejudice. On September 26, 2003, following a contested hearing, the trial court dismissed all claims against Harju with prejudice. The trial court also dismissed Sargent's racial discrimination claim and Sackett-DanPullo's marital discrimination claim.

¶25 On May 3, 2004, the trial court informed the parties that there would not be a jury trial, even though the County had demanded a jury trial, and the parties and the trial court had entered such a stipulation. Therefore, the plaintiffs took a voluntary nonsuit under CR 41(a)(1)(B). Two days later, on May 5, 2004, the plaintiffs refiled their action in Mason County Superior Court against "THURSTON COUNTY (THURSTON COUNTY OFFICE OF THE PROSECUTING ATTORNEY)" (*Broyles* II). CP at 4416-24. As in *Broyles* I, the County admitted that the plaintiffs were county employees and denied that Holm acted on the County's behalf.

¶26 On March 6, 2006, the County filed two summary judgment motions. The trial court granted the County's motions in part, dismissing some claims.[1] However, the

---

[1] Specifically, the trial court dismissed (1) plaintiffs' allegation that the County failed and refused to properly investigate claims according to its own policies and procedures, (2) plaintiffs' allegation that the County failed to train, (3) plaintiffs' allegation that the County conducted a negligent investigation, and (4) plaintiffs' allegation that the County wrongfully terminated Broyles' salary and benefits after the nonsuit.

trial court denied the motions insofar as they were based on the following four arguments: (1) that plaintiffs' allegations were time barred as based on acts occurring before May 6, 2001, (2) that plaintiffs could not base liability on previously dismissed acts, (3) that the acts plaintiffs cited in support of its retaliation and constructive discharge claims were not actionable, and (4) that the County could not be liable for any wrongful acts Holm may have committed because it did not control his actions.

¶27 Before trial, the court granted in part the plaintiffs' motion to exclude evidence that Sargent sued her former employer, Foster Pepper, and her later employer, State Farm, for emotional distress. The trial court granted the motion as to State Farm but allowed the County to present evidence that Sargent sued Foster Pepper in order to establish an alternative cause of her injuries.

¶28 The trial court also granted the County's motion in limine to exclude "[a]ny reference to punitive damages, including any reference, statement or insinuation that the jury should send a message to Thurston County." CP at 2643. The trial court denied the County's motion to amend its answer to retract its admissions that the plaintiffs were county employees.

¶29 After a three-week trial, the jury found in favor of all three plaintiffs, awarding $599,000 to Broyles, $250,000 to Sargent, and $673,000 to Sackett-DanPullo. The trial court later denied the County's motion for judgment as a matter of law or for a new trial.

¶30 The plaintiffs then moved for an award of attorney fees under the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, asking for fees for the work in both *Broyles* I and *Broyles* II. The court granted this motion, awarding $1,296,108.00 in attorney fees and $158,474.62 in costs. The trial court used a 1.5 lodestar multiplier in setting its attorney fees award.

## ANALYSIS

I. THURSTON COUNTY'S LIABILITY

A. Effect of County's Admissions

¶31 Preliminarily, the parties dispute whether the County, in effect, conceded liability by admitting in its answer to the plaintiffs' complaint that the County was the employer. The County answered:

1. In answer to paragraph 1 of the Complaint, defendant admits that plaintiff Audrey Broyles was an employee of Thurston County, and that she worked as a Deputy Prosecuting Attorney in the Criminal Division of the Thurston County Prosecutor's Office. Except as specifically admitted, the defendant denies every other allegation therein.

2. In answer to paragraph 2 of the Complaint, defendant admits that plaintiff Vonda Sargent was an employee of Thurston County, and that she worked as a Deputy Prosecuting Attorney in the Criminal Division of the Thurston County Prosecutor's Office. Except as specifically admitted, the defendant denies every other allegation therein.

3. In answer to paragraph 3 of the Complaint, defendant admits that plaintiff Susan Sackett-DanPullo was an employee of Thurston County, and that she worked as a Deputy Prosecuting Attorney in the Criminal Division of the Thurston County Prosecutor's Office. Except as specifically admitted, the defendant denies every other allegation therein.

. . . .

5. In answer to paragraph 5 of the Complaint, defendant denies that any and all alleged acts or omissions complained of were on behalf of Thurston County [or] occurred within the scope of any manager, supervisor, agent, employee or representative's employment. Furthermore, defendant specifically denies that the acts or omissions of Prosecutor Edward Holm, an independently elected official, were on behalf of Thurston County or that Holm was an employee, agent or representative of Thurston County. Thurston County additionally denies any agency and/or respondeat superior responsibility for the alleged ac-

tions of Harju and Powers since these defendants have been dismissed with prejudice. Except as specifically admitted, the defendant denies every other allegation therein.

CP at 4405-06.[2]

¶32 The County asserts that the admission was not an acceptance of vicarious liability for Holm's actions. It points out that one may raise an affirmative defense of failure to join an indispensable party in any pleading, by any motion, or at the trial on the merits. CR 12(h)(2).[3] The County also argues that the court is not bound by a legal admission, as opposed to a factual one. *State v. Knighten*, 109 Wn.2d 896, 902, 748 P.2d 1118 (1988). Finally, it argues that the plaintiffs cannot show any justifiable reliance on the admission as the remainder of its answer clearly spells out that it is contesting its liability for Holm's actions.

¶33 The plaintiffs disagree, claiming that they justifiably relied on the admission and that the County should be held to this admission. *Neilson v. Vashon Island Sch. Dist. No. 402*, 87 Wn.2d 955, 958, 558 P.2d 167 (1976). They claim that the County's belated efforts to ignore its own factual

---

[2] Thurston County similarly "denies that Edward Holm was plaintiffs' 'employer' as defined by RCW 49.60.040(3)," CP at 4406-07; "denies that Prosecutor Edward Holm was an employee of Thurston County," CP at 4407-08; "[t]o the extent this paragraph is directed to the acts or omissions of Prosecutor Edward Holm, an independently elected official over which defendant has no control, . . . denies the same," CP at 4408-09; "denies that it had the authority to affect the terms and conditions of employment for any of the plaintiffs," CP at 4409-10; "denies that it had the authority to control or monitor the daily operation of Holm's office or administration," CP at 4410; and "denies it had the authority to supervise the day-to-day operations of the prosecutor's office," CP at 4411.

[3] This rule provides, in part:

**(h) Waiver or Preservation of Certain Defenses.**

. . . .

(2) A defense of failure to state a claim upon which relief can be granted, a defense of failure to join a party indispensable under rule 19, and an objection of failure to state a legal defense to a claim may be made in any pleading permitted or ordered under rule 7(a), or by motion for judgment on the pleadings, or at the trial on the merits.

CR 12.

admissions are not permitted. CR 8(b).[4] And finally, they argue that this was a factual admission and that the County is bound by it, pointing out that *Knighten*, 109 Wn.2d at 902, holds that *the court* is not bound by a legal admission. It does not hold that an admission does not bind a party.

¶34 In reply, the County, relying on *Card v. Western Farmers Ass'n*, 72 Wn.2d 45, 47, 431 P.2d 206 (1967), argues that it expressly gave notice to the plaintiffs that it was denying liability for Holm's actions and that it argued that theory throughout the litigation. It further argues that here, where the facts about the relationship between the parties were undisputed, the question of agency is one of law, not of fact, and thus it did not make a factual admission but a legal one. *O'Brien v. Hafer*, 122 Wn. App. 279, 284, 93 P.3d 930 (2004).

■ ¶35 *Card* controls. There, the plaintiff never denied the allegations in the counterclaim, but the plaintiff served interrogatories on the evidence in support of the counterclaim and the matter was fully litigated at trial. On appeal, the defendant claimed that he was entitled to judgment because the plaintiff never denied its averments. The court held:

> When the parties went to trial on a record wherein the counterclaim was not answered, defendant might have relied on Rule of Pleading, Practice and Procedure 8(d) (now CR 8(d)), and claimed the averments of the counterclaim were admitted, but when the trial was conducted entirely on the issues of the

---

[4] This rule provides, in part:

**(b) Defenses; Form of Denials.** A party shall state in short and plain terms his defenses to each claim asserted and shall admit or deny the averments upon which the adverse party relies. . . .

. . . .

**(d) Effect of Failure To Deny.** Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied in the responsive pleading. Averments in a pleading to which no responsive pleading is required or permitted shall be taken as denied or avoided.

CR 8.

account, all such admissions were deemed waived and the trial court properly treated the case as if a general denial were in the record, thus putting at issue all of the material facts of the counterclaim.

*Card*, 72 Wn.2d at 48. The County clearly denied any liability for Holm's actions from the onset of the litigation through trial. There could be no detrimental reliance by the plaintiffs. We address the claim.

B. County's Liability

¶36 The County further argues that it cannot be liable for the prosecuting attorney's acts because it could not control Holm or how he ran his office and that no agency relationship existed. The County further argues that if the plaintiffs wanted relief from Holm's actions, they needed to sue the Prosecuting Attorney's Office as it is independently liable under RCW 36.16.050(6) on the official bond. It argues that the legislature intended for public officials to defend themselves against suits involving their offices as any other reading would render the legislative mandate that the elected official "shall be responsible for the acts of his appointees upon his official bond" superfluous and unnecessary. RCW 36.16.070.

¶37 The plaintiffs argue two bases for finding the County liable: First, Holm was a county officer and as an owner, manager, partner, or corporate officer who personally participated in the harassment, his conduct is per se evidence of imputation. *Glasgow v. Ga.-Pac. Corp.*, 103 Wn.2d 401, 407, 693 P.2d 708 (1985). Second, the County's failure to respond to the reported harassment after investigating the allegations made it liable for the unlawful harassment. *Glasgow*, 103 Wn.2d at 407.

¶38 Initially, the plaintiffs correctly point out that the County, not the county council, is a proper defendant, citing *Nolan v. Snohomish County*, 59 Wn. App. 876, 802 P.2d 792 (1990). *Nolan* held:

RCW 36.32.120(6), read together with RCW 36.01.010 and .020, makes clear the legislative intent that in a legal action

involving a county, the county itself is the only legal entity capable of suing and being sued. It follows that a county council is not a legal entity separate and apart from the county itself. Jurisdiction over the Snohomish County Council is achieved by suing Snohomish County. No purpose would be served by naming both the County and the County Council in this proceeding. The County argues that they are both indispensable parties, but the law gives no support to such a contention.

*Nolan*, 59 Wn. App. at 883. The same logic applies here: the County, not the prosecutor, is the proper party.[5]

¶39 A county is a municipal corporation authorized by law to exercise powers the State grants to it. RCW 36.01-.010. The County is no single person or entity. Rather, it exercises its powers through various commissioners, officers, and agents. RCW 36.01.030. Here, we hold that the County is not shielded from the administrative actions of its prosecutor or deputy prosecutors merely because their part of the county function lies in the prosecutor's office.

¶40 First, a corporation is "an artificial being, invisible, intangible, and existing only in contemplation of law," which by necessity "must act through its officers, directors or other agents." 18 AM. JUR. 2D *Corporations* §§ 1, 2 (2004) (footnote omitted). Similarly, a municipal corporation, such as a county, can act only through its agents. *See Houser v. City of Redmond*, 91 Wn.2d 36, 40, 586 P.2d 482 (1978). When a municipal corporation's agents act within the scope of their employment, their actions are the actions of the municipal corporation itself. *See Houser*, 91 Wn.2d at 40. As a county officer, the prosecuting attorney exercises the County's delegated power. RCW 36.16.030; *State v. Whitney*, 9 Wash. 377, 379, 37 P. 473 (1894) (prosecuting attorney is county officer). Therefore, when a county officer, such as a prosecuting attorney or deputy prosecuting attorney, exercises the county's powers, the officer's actions are the actions of the County itself.

---

[5] This does not exclude the possibility that the prosecuting attorney or his deputies could be personally liable. *Brown v. Scott Paper Worldwide Co.*, 143 Wn.2d 349, 361, 20 P.3d 921 (2001).

¶41 Second, the County is liable for its prosecuting attorney's discriminatory employment acts. Especially in the context of employment discrimination, either the state or local government must be responsible for the actions of the officers and agents that exercise governmental powers and act on the government's behalf. The Third Circuit recognized this principle when faced with a situation similar to ours in *Coleman v. Kaye*, stating:

> The extension of . . . agency principles to Coleman's sex discrimination suit against the County of Monmouth is logically unacceptable because *county prosecutors are clearly government officials who, reason dictates, must be acting on behalf of some governmental entity when they make personnel decisions*. The agency paradigm fails here because it would require us to reach the specious conclusion that Prosecutor Kaye was not acting under the authority of any state governmental body, either state or county.

87 F.3d 1491, 1503 (3d Cir. 1996) (emphasis added). The *Coleman* court went on to consider which level of state government county prosecutors "belong" to when making personnel decisions, concluding that "county prosecutors are acting as county officials when they make employment decisions." *Coleman*, 87 F.3d at 1503.

¶42 While the County should not be held liable for actions a prosecutor takes while representing the State, such as in filing or trying criminal cases, it is liable when the prosecuting attorney is acting for the *County* when performing administrative tasks, such as in making personnel decisions. *Whatcom County v. State*, 99 Wn. App. 237, 247, 993 P.2d 273 (2000) ("it is clear that a prosecutor acts for the county when performing administrative tasks unrelated to strictly prosecutorial functions (such as hiring or promotion decisions)" (citing *Coleman*, 87 F.3d at 1499)). Thus, the plaintiffs need not show that an agency relationship existed between the county commissioners and the prosecuting attorney. It is enough to show that Holm was acting as a county officer.

¶43 We agree with the *Coleman* court's analysis. When the prosecuting attorney is exercising his delegated powers in employment matters, he is acting for the County, and thus the County is liable for the consequences of those employment decisions. *See also Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir. 1993) (hostile work environment claim caused by prosecuting attorney's conduct is a claim against the county itself); *Houser*, 91 Wn.2d at 40 (a municipal corporation can act only through its agents, and when its agents act within the scope of their employment, their actions are the actions of the municipal corporation itself). In the context of employment discrimination, either the state or local government must be responsible for the actions of the officers and agents that exercise governmental powers and act on the government's behalf.[6]

¶44 The County cites numerous cases from other jurisdictions,[7] but none is persuasive here as none involves the WLAD and none holds that because a prosecuting attorney is an independently elected official, the County is shielded from liability for any of his conduct.

¶45 Finally, the plaintiffs also argue that the County is liable because it knew about the workplace discrimination and did nothing to remedy it and failed to enforce its own antiharassment and discrimination policies. They note that after the plaintiffs complained to Holm about the workplace conditions, Holm asked Peggy Quan, the county human resource director, to investigate the allegations. The County took no steps to address the gender discrimination complaints. *Glasgow*, 103 Wn.2d at 407. In light of

---

[6] Because we find that agency principles simply do not apply under the circumstances presented here, we find little guidance from *DeWater v. State*, 130 Wn.2d 128, 921 P.2d 1059 (1996), or *Francom v. Costco Wholesale Corp.*, 98 Wn. App. 845, 854, 991 P.2d 1182 (2000).

[7] *McGrath-Malott v. Maryland*, 2007 WL 609909, 2007 U.S. Dist. LEXIS 12716 (D. Md. 2007) (under state law, sheriff is state official, not county official); *Thompson v. Duke*, 882 F.2d 1180 (7th Cir. 1989) (county not liable under 42 U.S.C. § 1983 claim for failing to train sheriff's deputies); *Meade v. Grubbs*, 841 F.2d 1512 (10th Cir. 1988) (supervisor's liability cannot be imputed under 42 U.S.C. § 1983); *Moy v. County of Cook*, 159 Ill. 2d 519, 640 N.E.2d 926, 203 Ill. Dec. 776 (1994) (sheriff is county officer, not an employee of the county).

our holding that the County is liable as a matter of law, we need not address this alternative claim.

¶46 The superior court did not err in holding that the County was liable for workplace discrimination in the prosecutor's office.

## II. EVIDENCE SUPPORTING HOSTILE WORK ENVIRONMENT CLAIMS

¶47 The County asserts that the trial court erred in allowing the plaintiffs to present evidence about acts that occurred outside the statute of limitations. It argues that (1) the jury was impermissibly allowed to find a hostile work environment based on discrete discriminatory acts and based on Harju's and Jones's conduct that occurred before May 6, 2001; (2) collateral estoppel should have precluded any testimony about Harju's conduct; and (3) Sackett-DanPullo was improperly allowed to present evidence of discrimination based on her marital status. We disagree.

To establish a claim for a hostile work environment, a plaintiff must file the claim within the applicable statute of limitations and must prove that harassment (1) was unwelcome, (2) was because she is a member of a protected class, (3) affected the terms and conditions of her employment, and (4) was imputable to her employer. *Domingo v. Boeing Employees' Credit Union*, 124 Wn. App. 71, 84, 98 P.3d 1222 (2004). To satisfy the third element, the harassment must be sufficiently pervasive so as to alter her employment conditions. *Washington v. Boeing Co.*, 105 Wn. App. 1, 10, 19 P.3d 1041 (2000). It is not sufficient that the conduct is merely offensive. *Adams v. Able Bldg. Supply, Inc.*, 114 Wn. App. 291, 296, 57 P.3d 280 (2002).

Discrimination claims must be brought within three years to satisfy the statute of limitations. *Antonius v. King County*, 153 Wn.2d 256, 261, 103 P.3d 729 (2004). Our Supreme Court in *Antonius* adopted the United States Supreme Court's analysis in *National Railroad Passenger Corp. v. Morgan*[, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002),] to determine whether an employer is liable for hostile work environment conduct that occurred more than three years before the plain-

tiff filed suit. 153 Wn.2d at 258. The court held that hostile work claims can occur over a series of days or years and generally are not single, discrete acts. *Antonius*, 153 Wn.2d at 264 (citing *Morgan*, 536 U.S. at 115). It held that " '[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.' " *Antonius*, 153 Wn.2d at 264 (alteration in original) (quoting *Morgan*, 536 U.S. at 117).

*Clarke v. Office of Attorney Gen.*, 133 Wn. App. 767, 785-86, 138 P.3d 144 (2006) (footnote omitted).

A. Conduct Outside the Limitations Period

¶48 The superior court denied the County's motion for summary judgment regarding the admission of acts occurring outside the limitations period. The court reasoned that there was a sufficient relationship between the discrete acts and discriminatory conduct predating the limitations period to allow a jury to consider those events for purposes of finding a hostile work environment. The County does not complain that the evidence was irrelevant under ER 403 or that it was unduly prejudicial under ER 404(b). As such, we address only whether the evidence was admissible at all.

1. Acts related to promotion, transfer, and compensation

¶49 The County first argues that the actions of Jones and Harju that occurred outside the limitation period should not have been used to support the plaintiffs' hostile work environment claim because some of the acts complained of related to work assignments, pay, and benefits and thus were "discrete acts," separately actionable, were not harassment, and, therefore, cannot be part of a hostile work environment claim.[8]

¶50 However, as the *Morgan* Court points out, these time-barred acts are potentially admissible as evidence of a

---

[8] The County asserts the following as examples:

(1) Receiving less favorable work assignments than male prosecutors.

hostile work environment claim even though they are not admissible to support a claim for discrete discriminatory acts. *Morgan* discusses the relationship between discrete and nondiscrete discriminatory acts and the filing period in the context of a hostile work environment claim:

> We derive several principles from these cases. First, discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.
>
> . . . .
>
> Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice." Morgan can only file a charge to cover discrete acts that "occurred" within the appropriate time period. While Morgan alleged that he suffered from numerous discriminatory and retaliatory acts from the date that he was hired through March 3, 1995, the date that he was fired, only incidents that took place within the timely filing period are actionable.

*Morgan*, 536 U.S. at 113-14 (footnote omitted).

¶51 The *Morgan* Court then distinguishes hostile work environment claims from discrete discriminatory act claims:

> A hostile work environment claim is composed of a series of separate acts that collectively constitute one "unlawful employ-

---

(2) Receiving lower pay and benefit awards than male deputy prosecutors who had similar responsibilities and/or equal workloads.

(3) Receiving pay and benefit awards equal to male deputies who had fewer responsibilities and/or lighter work loads.

ment practice." 42 U. S. C. § 2000e-5(e)(1). The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

. . . A court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period.

*Morgan*, 536 U.S. at 117, 120.

¶52 In discussing *Morgan*, our Supreme Court observed the distinction between claims for discrete discriminatory acts and those supporting a hostile work environment claim:

The Court distinguished those cases involving discrete retaliatory or discriminatory acts, such as termination, failure to promote, denial of transfer, or refusal to hire, from cases involving claims of a hostile work environment. For discrete acts, the limitations period runs from the act itself, and if the limitations period has run, a discrete act is not actionable even if it relates to acts alleged in timely filed charges. *Morgan*, 536 U.S. at 108-13. However, the Court concluded that hostile work environment claims "are different in kind from discrete acts" and "[t]heir very nature involves repeated conduct."

*Antonius*, 153 Wn.2d at 264 (alteration in original) (quoting *Morgan*, 536 U.S. at 115).

¶53 In sum, a plaintiff with a hostile work environment claim may not use that claim to seek damages for a discrete discriminatory act that is time barred but, if otherwise admissible, may use that discrete act as background information if it tends to support a hostile work environment claim. In this case, the trial court instructed that the time-barred acts related to promotion, transfer, and com-

pensation could be considered only "for the purpose of determining whether there was a hostile work environment."[9] This instruction was entirely consistent with *Morgan* in that it told the jury to use these discrete acts only as evidence supporting the hostile work environment claim.

2. Acts related to sex discrimination and hostile work environment

¶54 The County argues that acts occurring outside the limitations period must be " 'part of the same actionable hostile work environment practice.' " *Antonius*, 153 Wn.2d at 271 (quoting *Morgan*, 536 U.S. at 120). In other words, the acts before the limitations period have to have some relationship to the timely conduct or they are not properly part of the same hostile work environment claim.[10] The County argues that Jones's conduct did not affect the plaintiffs after May 6, 2001, because Holm reorganized the

---

[9] The trial court's instruction 20 provided:

Certain evidence has been admitted in this case for only a limited purpose. This evidence consists of the following testimony by plaintiffs:
1. That before May 6, 2001, defendant failed to promote or transfer the plaintiffs comparable to male deputies of similar knowledge, training, qualifications and experience and that plaintiffs' gender was a substantial factor in the decision.
2. That before May 6, 2001, defendant failed to make a pay award to plaintiff Audrey Broyles comparable to male deputies with similar or less knowledge, training, qualifications, experience, workloads and responsibilities and that plaintiff Audrey Broyles' gender was a substantial factor in the decision.
 This testimony may be considered by you only for the purpose of determining if there was a hostile work environment, it may not be considered by you for any other purpose.
 Any discussion of the evidence during your deliberations must be consistent with this limitation.
CP at 914.

[10] The County lists the following acts in this regard:

(1) The prosecuting attorney and his office failed to investigate and respond to plaintiffs' complaints or conducted a negligent investigation into their complaints.

(2) Allegations that Jack Jones allegedly created a hostile environment or otherwise sexually discriminated against the plaintiffs.

(3) Allegations that Jim Powers failed to end the alleged sexual discrimination and hostile environment.

(4) Allegations that Phil Harju created a hostile environment or otherwise sexually discriminated against the plaintiffs.

office in January 2001 and demoted Jones to drug court, and there was evidence that after this demotion, Jones secluded himself in his office and took classes for anger management and interpersonal relationships. Similarly, the County asserts that Harju's conduct all occurred before the reorganization and that, after that date, he was no longer in a supervisory role with respect to the plaintiffs. The County asserts that the trial court compounded this problem by refusing its proposed instructions 47, 48, and 61, which would have instructed the jury that a nexus must exist between the prior conduct and the offensive conduct during the limitations period.[11]

¶55 The County argues that failing to give these instructions allowed the jury to impose liability on the hostile work environment claims based on acts unrelated to acts within the filing period. However, *whether the discriminatory acts*

---

[11] These proposed instructions were:

Defendant's Proposed Instruction 47:

Plaintiffs are barred under the Statute of Limitations from seeking compensation for any gender discrimination prior to May 6, 2001. Therefore, any failure by Ed Holm prior to May 6, 2001, to promote a plaintiff comparable to male deputy prosecuting attorneys of similar ability, experience, training and skill or pay her comparable to male deputy prosecuting attorneys of similar ability, experience, training and skill, where a significant motivating factor is her sex, does not constitute gender discrimination.

CP at 1042.

Defendant's Proposed Instruction 48:

Alleged conduct occurring before May 6, 2001 is not recoverable unless it has some relationship to conduct occurring after May 6, 2001 so as to constitute part of the same alleged hostile work environment claim. To be sufficiently related the conduct must involve the same type of employment actions, occur relatively frequently, and be perpetrated by the same managers. If there is no relation, or if there is an intervening action by the employer, the act is no longer part of the same alleged hostile environment claim and, therefore, is time barred.

CP at 1043.

Defendant's Proposed Instruction 61:

Alleged conduct of Jack Jones occurring before May 6, 2001 is not recoverable unless you find the alleged conduct is sufficiently related to other conduct occurring after May 6, 2001 to form part of the same hostile work environment claim.

CP at 1057.

*within the filing period were part of a continuing hostile work environment is largely a factual question.*

¶56 Under *Antonius* and *Morgan*, plaintiffs needed to prove a gender-based act within the limitations period in order to present earlier discriminatory acts. There was ample testimony that Holm's reorganization did nothing to alleviate the problems in the office. After the plaintiffs complained to Harju about Jones's conduct, Harju was dismissive, recommended that they let it blow over, and told them to stay out of Jones's way. Then, rather than receiving a demotion, Jones was promoted and remained in his same office. There was testimony that after the reorganization, Jones continued to exhibit hostile, intimidating behavior. Holm's reorganization did little if anything to alleviate the gender-based problems in the office. Further, Broyles testified that the reorganization did not stop Harju's offensive conduct. In fact, she testified that after the plaintiffs spoke with Holm, Harju became "increasingly hostile." RP at 111. Sargent described her work environment after their meeting with Holm as "like walking into enemy camp every morning." RP at 530.

¶57 All three plaintiffs testified about ongoing hostility continuing through the fall of 2001 and, thus, Harju's and Jones's previous offensive conduct was properly admitted to support the hostile workplace claim. It was for the jury to determine whether these acts were part of a hostile work environment. *Antonius*, 153 Wn.2d at 271-73 (a reasonable jury may regard alleged conduct as part of one unlawful employment practice even if there is a two-year gap in events).

¶58 The testimony presented to the jury showed that plaintiffs remained in the same hostile work environment after the statutory period as before. The trial court acted well within its discretion in allowing evidence of prior conduct that directly contributed to the workplace discrimination.

¶59 The County fails to show error.

438

## B. Collateral Estoppel

 ¶60 Next the County argues that the trial court erred in not applying collateral estoppel to prevent plaintiffs from presenting evidence that Harju's acts were discriminatory. Specifically, the County explains that the trial court granted its motion for summary judgment as to any claim that Harju created a hostile work environment, and thus collateral estoppel should have prevented the plaintiffs from presenting evidence that his conduct constituted an hostile work environment. It argues that because the trial court granted summary judgment, it necessarily found that the plaintiffs had failed to prove any one of the elements of its hostile work environment claim.

> Collateral estoppel may be applied to preclude only those issues that have actually been litigated and necessarily and finally determined in the earlier proceeding. *Shoemaker*, 109 Wn.2d at 507.[12] Further, the party against whom the doctrine is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding. *Nielson v. Spanaway Gen. Med. Clinic, Inc.*, 135 Wn.2d 255, 264-65, 956 P.2d 312 (1998). For collateral estoppel to apply, the party seeking application of the doctrine must establish that (1) the issue decided in the earlier proceeding was identical to the issue presented in the later proceeding; (2) the earlier proceeding ended in a judgment on the merits; (3) the party against whom collateral estoppel is asserted was a party to, or in privity with a party to, the earlier proceeding; and (4) application of collateral estoppel does not work an injustice on the party against whom it is applied. *Reninger*, 134 Wn.2d at 449[13]; *State v. Williams*, 132 Wn.2d 248, 254, 937 P.2d 1052 (1997); Trautman, *Claim and Issue Preclusion*, 60 WASH. L. REV. at 831.[14]

*Christensen v. Grant County Hosp. Dist. No. 1*, 152 Wn.2d 299, 307, 96 P.3d 957 (2004).

---

[12] *Shoemaker v. City of Bremerton*, 109 Wn.2d 504, 507, 745 P.2d 858 (1987).

[13] *Reninger v. Dep't of Corr.*, 134 Wn.2d 437, 449, 951 P.2d 782 (1998).

[14] Philip A. Trautman, *Claim and Issue Preclusion in Civil Litigation in Washington*, 60 WASH. L. REV. 805, 831 (1985).

¶61 The County asserts that this identical issue was previously litigated, it ended in a judgment against the plaintiffs, Harju is the same party as in the earlier proceeding, and it works no injustice on the plaintiffs because they have already fully litigated this issue. They cite to the plaintiffs' argument in opposition to summary judgment:

[Harju] personally subjected Plaintiffs to unwelcome conduct based upon their sex and race when he treated them differently than white male DPA's by publicly criticizing their caseloads and the caseloads of other women, requiring them to attend "mandatory" meetings that were run like a "boys club" and were offensive and uncomfortable for women, assigning women the most undesirable tasks, singling women's leave requests out for scrutiny, publicly attacking Broyles (the only woman supervising a felony unit) and calling her names, suggesting Broyles had her position due to her looks or her "special relationship" with Prosecutor Ed Holm, and continually leering and staring at their and other women's breasts and slowly and deliberately looking them and other women up and down in a sleazy fashion.

CP at 5739-40.

¶62 The plaintiffs counter that the trial court properly ruled that collateral estoppel did not apply because the issue in *Broyles* I, whether Harju was individually liable, was quite different than in *Broyles* II, where the issue was whether the County was liable for gender discrimination and/or retaliation by plaintiffs' co-workers, including Harju. Citing *Brown v. Scott Paper Worldwide Co.*, 143 Wn.2d 349, 361, 20 P.3d 921 (2001), the plaintiffs argue that both the supervisor and the employer may be liable for workplace discrimination but the employer is not necessarily released from liability if the supervisor is not found personally liable.

¶63 This interpretation exceeds *Brown*'s reach. The court actually held that

individual supervisors, along with their employers, may be held liable for their discriminatory acts. The plain meaning of RCW 49.60.040(3), by its very terms, encompasses

individual supervisors and managers who discriminate in employment. Moreover, enabling employees to sue individual supervisors who have discriminated against them is consistent with the broad public policy to eliminate all discrimination in employment.

*Brown*, 143 Wn.2d at 361-62. Nonetheless, the issue before the trial court on summary judgment was whether Harju, as a supervisor, was personally liable for the workplace discrimination. The court granted the County summary judgment on this issue without explanation. It did not, however, rule that the County was not responsible for the hostile work environment that the combined actions of Harju, Jones, Holm, and other DPAs created. Collateral estoppel does not apply. The trial court did not err.

C. Marital Status Discrimination

¶64 The County also argues that the trial court allowed Sackett-DanPullo to give improper prejudicial testimony about marital and race discrimination, not gender. As noted above, the plaintiff-employee's gender must be the motivating factor for the unlawful discrimination. *Glasgow*, 103 Wn.2d at 406.

¶65 Sackett-DanPullo testified that a general felony position opened in the office that she wanted to pursue, rather than continue in juvenile prosecutions. At first, Holm approved but then, a month later, told her that he wanted her to take a community prosecution position instead. When she told him she was not interested in that position, Holm responded, "[Y]ou'll be great for it. You're— you know, you live out in Lacey, which is where they thought it would be. And your husband's black, it's a great fit for you." RP at 1377. The plaintiffs argue that this testimony was appropriate because it was further evidence of the negative treatment of women in the workplace and that they were given assignments based on gender stereotypes, not merit. They argue that this testimony shows that women were not offered the same merit-based opportunities as men and this was another example of gender-based discrimination.

¶66 We review the decision to admit evidence for an abuse of discretion. *Davis v. Globe Mach. Mfg. Co.*, 102 Wn.2d 68, 76, 684 P.2d 692 (1984). Holm told Sackett-DanPullo that her husband's personal characteristics were an important factor in his choice of selecting her for the position. As this testimony reasonably supports a gender discrimination claim, the trial court did not abuse its discretion in allowing it into evidence. *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 107, 864 P.2d 937 (1994).

III. EVIDENCE ABOUT PLAINTIFFS' MEETING WITH AN ATTORNEY

¶67 The County next asserts that the trial court erred in excluding testimony that the plaintiffs did not have a subjective belief of discrimination until after meeting with an attorney.

¶68 In December 2000, the three plaintiffs and Christy Peters, a DPA, had a meeting with the same lawyers who would ultimately represent the plaintiffs. Over the County's objection, the trial court disallowed any testimony about the substance of that meeting, finding that it was privileged communications and that the plaintiffs had not waived the privilege. The County made an offer of proof that Peters did not believe that she was a client at the time of the meeting. The County argues that Peters's testimony was important to show that the plaintiffs never regarded the harassment as abusive until they met with the attorneys, a key element of a hostile work environment claim. *Clarke*, 133 Wn. App. at 787; *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) ("if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment").

¶69 The County argues that no privilege existed and therefore the trial court erred as a matter of law in

excluding Peters's testimony on this basis. RCW 5.60.060(2) bars testimony protected by the attorney-client privilege.[15]

> The initial inquiry for purposes of RCW 5.60.060(2) is whether an attorney-client relationship or other protected relationship exists. An attorney-client relationship is deemed to exist if the conduct between an individual and an attorney is such that the individual subjectively believes such a relationship exists. *In the Matter of the Disciplinary Proceeding Against McGlothlen,* 99 Wn.2d 515, 522, 663 P.2d 1330 (1983). However, the belief of the client will control only if it "is reasonably formed based on the attending circumstances, including the attorney's words or actions." *State v. Hansen,* 122 Wn.2d 712, 720, 862 P.2d 117 (1993) (quoting *Bohn v. Cody,* 119 Wn.2d 357, 363, 832 P.2d 71 (1992)). The determination of whether an attorney-client relationship exists is a question of fact. *Bohn,* 119 Wn.2d at 363. The burden of proving the existence of the relationship and that the information the Dietzes sought fell within the privilege rested squarely with Doe. *R.A. Hanson Co. v. Magnuson,* 79 Wn. App. 497, 501, 903 P.2d 496 (1995), *review denied,* 129 Wn.2d 1010, 917 P.2d 130 (1996).

*Dietz v. John Doe,* 131 Wn.2d 835, 843-44, 935 P.2d 611 (1997).

¶70 The County also argues that the "common interest doctrine" does not apply because no privilege existed and that the trial court erred in relying on the doctrine. *See Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.,* 152 F.R.D. 132, 140 (N.D. Ill. 1993) (common interest doctrine does not apply when privilege does not shield documents from discovery).

 ¶71 Under the "common interest" rule, "communications exchanged between multiple parties engaged in a common defense remain privileged under the attorney-client privilege." *C.J.C. v. Corp. of Catholic Bishop of Yakima,* 138 Wn.2d 699, 716, 985 P.2d 262 (1999).

---

[15] This statute provides, in part, "An attorney or counselor shall not, without the consent of his or her client, be examined as to any communication made by the client to him or her, or his or her advice given thereon in the course of professional employment." RCW 5.60.060(2)(a).

¶72 In finding the communications privileged, the trial court explained:

> It's clear to me that all of the people went to see Ms. Bloomfield and Mr. Connelly as attorneys to get legal advice about their situation at work. They went as a group. An attorney/client relationship resulted from that meeting when they went to get legal advice about their situation at work. This attorney/client relationship existed, even though they weren't paid a dollar. That's the consequence of going to see attorneys in a confidential situation and asking them questions.
>
> Going as a group with a common problem, statements of all are protected. And no one individual at that meeting can waive privilege for all. And so I believe that the attorney/client privilege prevailed at that meeting and should be honored.
>
> It's been suggested that other factors outweigh the importance of the attorney/client privilege and I quite frankly don't see it that way. I think this is the kind of situation that the attorney/client privilege is designed to protect, and it does protect. I don't see any countervailing factors that would compel the piercing of that relationship. . . .
>
> My ruling is that there was an attorney/client relationship and that one of the people who was present at the meeting can't waive it in the face of the other clients not joining in it.

RP at 1954-55.

¶73 We find no error in the trial court's conclusion that the communications that took place in this meeting were privileged. *Dietz*, 131 Wn.2d at 845; *State v. Emmanuel*, 42 Wn.2d 799, 815, 259 P.2d 845 (1953). They remained privileged regardless of whether Peters thought she was a client or was willing to waive the privilege. It is for the court to determine the existence of an attorney/client relationship, and Peters cannot waive the privilege because she was not an opposing party in the litigation. *Billias v. Panageotou*, 193 Wash. 523, 526, 76 P.2d 987 (1938); *see also Redding v. Virginia Mason Med. Ctr.*, 75 Wn. App. 424, 429, 878 P.2d 483 (1994) (quoting *Cummings v. Sherman*, 16 Wn.2d 88, 96, 132 P.2d 998 (1943)).

IV. EFFECT OF CLOSING ARGUMENT ON JURY VERDICT

¶74 The County asserts that the jury verdicts were excessive in light of plaintiffs' counsel's remarks during closing argument that it should find for the plaintiffs so that this does not happen again. It argues that this is a case where the awarded damages are so excessive "as unmistakably to indicate that the verdict must have been the result of passion or prejudice." CR 59(a)(5). It argues that since punitive damages are not permitted in WLAD cases, and plaintiffs' counsel asked the jury to never let this happen again, he was clearly arguing for the jury to punish the County. *See Dempere v. Nelson*, 76 Wn. App. 403, 410, 886 P.2d 219 (1994). It argues that the damages were not commensurate with the evidence because Broyles was fully compensated for her lost wages and attended only two counseling sessions, and yet the jury awarded her $600,000. It also argues, without explanation, that "[t]he same can be said for both Sackett-DanPullo and Sargent." Appellant's Br. at 65.

¶75 During rebuttal closing argument, plaintiffs' counsel talked to the jury about assessing damages:

> Then the third and most difficult one is figuring out how much in damages. And I agree with Ms. Bloomfield; it is very difficult to talk to a jury as to what money damages should be. But what I can tell you is what you had there were three rising stars, women who had invested their lives into the idea of being prosecutors in Thurston County. And when what they found is not only did they lose their jobs, but they lost their dignity.
>
> Now you are not to award a single dollar of damages for the fact that they had to go through this litigation. That's not what this is about. But losing their jobs and losing their integrity in front of the Thurston County Prosecutor's office, Thurston County community, and the lawyers of this state, in addition to their family and to their future employers, that is all compensable.
>
> These women didn't make up six broken teeth. These women didn't make up sleepless nights, dreams, and -- and the kind of

things that they have had to go through. What they suffered was a loss of their identity they had worked their whole lives to create. There is no price that's high enough for that.

We ask you to use your best judgment to determine what fair compensation is and to award that so that what will happen to these women will never happen again.

RP at 3111-12. Defense counsel then objected but the trial court overruled the objection. This was error because the jury was asked to award damages for a reason the jury instructions did not authorize. At the same time, not every misguided closing argument warrants a new trial. *See Carnation Co. v. Hill*, 115 Wn.2d 184, 186-87, 796 P.2d 416 (1990) (misconduct must have a substantial likelihood of affecting the jury's verdict). Here the comment, though improper, was unclear, difficult to follow, and confusing at best. "[T]o award that so that what will happen to these women will never happen again" speaks to future harm to the plaintiffs and asks the jury to award damages to prevent that. RP at 3112. It is not a clear call to the jury to impose punitive damages. Even if that was the intent, it did not succeed. The jury awarded substantially fewer damages than counsel requested.[16]

¶76 Counsel specifically asked the jury to find "fair compensation" for the injuries these women had suffered. In our view, this was a request that the jury make the plaintiffs whole. The evidence as a whole showed that the plaintiffs suffered physically, emotionally, and profession-ally because of the hostility exhibited toward them in the workplace and counsel's argument sought recompense for those injuries. *See Conrad v. Lakewood Gen. Hosp.*, 67 Wn.2d 934, 940, 410 P.2d 785 (1966) (verdict not so exces-sive as to warrant inference that it was not based on objective valuation).

---

[16] Counsel asked the jury to award $333,000 in economic damages for Broyles and $600,000 total. She asked for $173,000 in economic damages for Sackett-DanPullo and $800,000 total. And she asked for no economic damages for Sargent and $400,000 total.

## V. Attorney Fees Below

¶77 Finally, the County asserts that the trial court abused its discretion in its attorney fee award when plaintiffs were not entitled to recover for work on *Broyles* I and that the trial court relied on the same factors justifying the hourly rate as justifying the lodestar multiplier.

■■ ¶78 Successful plaintiffs under the WLAD are entitled to recover their attorney fees and costs incurred in pursuing their claims. *See* RCW 49.60.030(2) (right to recover costs of suit and reasonable attorney fees). We review such an award for an abuse of discretion. *Tribble v. Allstate Prop. & Cas. Ins. Co.*, 134 Wn. App. 163, 170, 139 P.3d 373 (2006).

¶79 In support of its award, the trial court made the following unchallenged findings of fact:

1. The Plaintiffs' gender discrimination and retaliation claims were tried between October 31 and November 17, 2006 before a jury of twelve. After deliberating on November 20 and 21, 2006, the jury found in favor of each Plaintiff on all causes of action submitted to the jury, including gender discrimination and retaliation claims and awarded a combined total verdict of $1.52 million in damages. Plaintiffs are the prevailing parties in this matter.

2. Hourly Rates. The presumptive reasonable hourly rate for an attorney is the rate the attorney charges. In this case, Plaintiffs have submitted undisputed evidence of their reasonable hourly rates, which are based on the rates they charge other clients for hourly work. Based on the evidence submitted, Plaintiffs' attorney's rates were consistent with rates of other comparable lawyers in the Puget Sound area. There was no evidence offered to suggest that the rates charged by Plaintiffs' counsel were unreasonable. Defendant submitted their [sic] own attorneys' hourly rates, which were less than some of the rates charged by some of plaintiffs [sic] counsel. Nevertheless, the evidence also indicated that the rates charged by defense lawyers is often less than the rates charged by other trial lawyers in the area. Defendant also submitted evidence from another Puget Sound area lawyer that was not inconsistent with the hourly rates charged by Plaintiffs counsel.

3. The reasonable geographic area for purposes of determining a reasonable hourly rate for Plaintiffs' counsel is the entire Puget Sound region. It was reasonable that Plaintiffs chose counsel outside Thurston and Mason Counties. It would be difficult to find law firms in Mason and Thurston Counties that would have the capability and capacity to deal with a case of this nature. Plaintiffs should not be unreasonable [sic] restricted from choosing counsel. The rates charged by Plaintiffs' lawyers are consistent with rates charged by other lawyers within the Puget Sound area. Therefore, I find that the hourly rates charged by Plaintiff's lead counsel, Stephanie Bloomfield, and for co-lead counsel, J. Richard Creatura, throughout this litigation are reasonable. I also find that the rates charged by other Gordon Thomas Honeywell attorneys and staff who worked on this matter are reasonable.

4. <u>Amount of Time and Costs Expended</u>. The evidence submitted specifically set forth the tasks that were performed, the time spent on the tasks, who performed the tasks and the rates charged by that attorney or staff member at the time the work was performed. The costs incurred were specifically detailed and explained, including amounts, dates of expenses and the identity of the persons or entities paid. Plaintiffs provided reasonable and detailed records that the Court has independently reviewed and evaluated. There was no evidence submitted by Defendant to suggest that the Plaintiffs' records were inaccurate. The time records did not reflect duplicative or unnecessary work. The Court was not able to identify hours that were unreasonable. To the contrary, based on the Court's review of the work performed, it was performed at a very high level and appeared to be consistent with the complexity and specialized circumstances of the case.

5. While Plaintiffs did not succeed in every claim they initially brought, all of Plaintiffs' claims derived from the same statutory protections of Washington's Law Against Discrimination (RCW 49.60 *et seq*[.]). The claims involved interrelated events and overlapping legal theories. The claims against the individual defendants were substantially identical to those that were tried against the County. The legal theories and evidence submitted was overlapping and part of a single set of operative facts. Essentially, the claims dismissed before trial were just different approaches to the same damages and were

so closely intertwined with the claims that were tried that there is no reasonable means to segregate time among the various claims. The fact that other claims were dismissed did not result in any significant or ascertainable difference in the damages claimed by the Plaintiffs.

6. The time spent on unsuccessful claims is not reasonably or realistically segregable from the time spent upon successful claims for gender discrimination and retaliation. All of the fees and costs were associated with the same general issues in the litigation and out of the same operative facts. The unsuccessful claims were premised upon the same facts and issues underlying the successful claims against the County and were merely alternate avenues of obtaining the damages that Plaintiffs were awarded at trial. All of the causes of action included in the jury verdict were causes of action which expressly authorize an award of attorneys' fees and costs to the prevailing Plaintiffs.

7. Progress toward a jury trial may be derailed by a number of issues, which are common in civil litigation. In this case, Plaintiffs filed a non-suit because of a procedural issue that arose regarding the availability of a jury trial. The nonsuit was taken to preserve an important right, the Plaintiffs' right to a jury trial. While the court cannot determine if any fault should be attributed to either party for this nonsuit, it is clear that in this case the nonsuit was not the end of one case and the beginning of a different case, but part of the continued pursuit of the same claims against the County. The nonsuit may have interrupted the progress of the case, but the Plaintiffs ultimately prevailed on the nonsuited claims against the County. Much of the work that was performed in the first case was of value and was used in the second case following the nonsuit. Depositions from before the date of the nonsuit were used at trial, exhibits that were admitted as evidence at trial were documents obtained in discovery before the date of the nonsuit, legal analysis and many pleadings drafted before the date of the nonsuit were subsequently used as well. Much of the work that was required after the nonsuit was the result of the Defendant's discovery and motion initiatives and it was appropriate that Plaintiffs' counsel respond to these initiatives in order to advocate their clients' legal rights. To cut off recovery of attorneys' fees as of the date of the nonsuit would be a contrivance and would not serve the purpose or the remedies provided by Washington's Law Against Discrimination.

8. I find the fees and costs sought by Plaintiffs were reasonably incurred in this matter and should be recovered without deduction or penalty.

9. <u>Multiplier.</u> The claims involved in this lawsuit required a great deal of lawyer and staff time to pursue them, due to the novelty and difficulty of the claims and the vigorous defense. Undertaking this representation significantly impacted the ability of the lead lawyers to work on other matters and constituted a significant risk to Plaintiffs' law firm if it did not recover fees. This case was unique, involving complex issues of employment law and governmental liability. From the beginning this was an exceptional case that presented an exceptional challenge for Plaintiffs' counsel. This case required a high level of skill in the specialized area of employment law involving governmental entities as well as a high level of skill in trial preparation and trial presentation. This case was taken on a contingency basis and involved substantial risk of no recovery. Few law firms in the Puget Sound region are equipped to take these kinds of risks on behalf of a client. Although the recovery was substantial, at the time of accepting the case it was a significant risk.

10. The experience, reputation and abilities of the lawyers representing Plaintiffs were of a very high caliber and the lawyers were skilled. I find that Plaintiffs' counsel provided exceptional representation in this case.

11. In light of the substantial risk and the quality of representation, the court finds that an upward adjustment from the lodestar is appropriate and a multiplier of 1.5 should be applied to all fees through the date of the jury's verdict (November 21, 2006).

12. The court finds that the risk was not as substantial after the jury's verdict and therefore finds that a multiplier shall not apply to attorneys fees incurred after the date of the jury's verdict.

13. The fees and costs related to work on various post trial matters were reasonable, including the time spent on the motion for fees and the motion for a supplemental judgment relating to a tax offset.

14. The court finds that the following amounts of fees and costs are reasonable:

| Fees through 11/21/06 | 832,556.00 |
| 1.5 Multiplier for work prior to the verdict | 416,278.00 |
| Fees 11/22-12/1/06 | 5,874.00 |
| Fees 12/1 - 12/31/06 | 5,407.50 |
| Fees 1/1- 2/13/07 | 23,362.50 |
| Fees 2/14 - 2/26/07 | 12,630.00 |
| Total Attorneys' Fees Awarded: | $1,296,108.00 |
| Costs Awarded: | $158,474.62 |

CP at 4-9.

A. Voluntary Nonsuit

¶80 The County first asserts that because the plaintiffs took a voluntary nonsuit in *Broyles* I, it was the prevailing party in that cause of action and the trial court could not award attorney fees and costs to the plaintiffs. *See Andersen v. Gold Seal Vineyards, Inc.*, 81 Wn.2d 863, 867-68, 505 P.2d 790 (1973) (that plaintiff takes a voluntary nonsuit shows that plaintiff failed to prove his claim). *But see Blair v. Wash. State Univ.*, 108 Wn.2d 558, 572, 740 P.2d 1379 (1987) (party partially prevailing on WLAD claim could recover for all work performed if there is no reasonable way to segregate successful and unsuccessful claims).

¶81 The County claims that judicial estoppel prevents the plaintiffs from claiming that *Broyles* I and *Broyles* II were the same case since it would allow the plaintiffs to take "a factual position that is inconsistent with his or her factual position in a previous litigation." *Miles v. Child Protective Servs. Dep't*, 102 Wn. App. 142, 153 n.21, 6 P.3d 112 (2000). Specifically, the County cites the plaintiffs' position when arguing that they could file an affidavit of prejudice against Judge Costello because "the nonsuit [of *Broyles* I] create[d] a new proceeding" in *Broyles* II. RP (Apr. 14, 2006) at 5. Further, the trial court accepted the plaintiffs' argument, ruling that "the original case is now a nullity." RP (Apr. 14, 2006) at 8.

¶82 What the County fails to note, however, is that it argued that *Broyles* II was not a new proceeding: "[A]nd it

is our position that this case, which was subsequently filed, is not a new proceeding. . . . In essence, the claim was pretty much the same as it existed previously, except for the omission of Ed Holm as a direct party defendant as the prosecutor. And in addition to that, Your Honor, they've treated it as though it's the same proceeding in all of their arguments on summary judgment by claiming there's collateral estoppel." RP (Apr. 14, 2006) at 3-4.

¶83 Citing *Walji v. Candyco, Inc.*, 57 Wn. App. 284, 787 P.2d 946 (1990), the County argues that allowing recovery for work performed before a nonsuit is unworkable. In *Walji*, the plaintiff filed a nonsuit and the trial court awarded the defendants reasonable attorney fees and costs, and the court of appeals affirmed. The County argues that such a result is unworkable in that had the plaintiff there filed a new lawsuit and prevailed, the defendants would have to return all the attorney fees and costs awarded to them in the first action.

¶84 The circumstances are quite different here. When it became apparent two weeks before trial that a jury trial was not possible, the plaintiffs filed a voluntary nonsuit in order to exercise their jury trial right. There was no confusion and, as illustrated above, the County viewed this as a continuation of the same litigation. It was reasonable for the trial court to find that, in fact, this was the same action, that the preparation in *Broyles* I had considerable overlap with *Broyles* II, and that it was appropriate to treat the case for what it was, one continuous process of reaching judgment. Although there must have been some duplication of effort resulting from the voluntary nonsuit, the trial court had no reasonable way of quantifying that inefficiency. We find no abuse of discretion in the award as it relates to hours and charges.

B. Risk To Justify Lodestar Multiplier

¶85 The County complains that the trial court improperly used the same factors to justify the hourly attorney fees rate as to justify its use of a 1.5 multiplier.

¶86 Washington follows the lodestar method of determining reasonable attorney fees. *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 597-99, 675 P.2d 193 (1983). The lodestar approach involves two steps. First, the trial court multiplies "a *reasonable* hourly rate by the number of hours *reasonably* expended on the matter." *Scott Fetzer Co. v. Weeks*, 122 Wn.2d 141, 149-50, 859 P.2d 1210 (1993); *Bowers*, 100 Wn.2d at 597. Second, the trial court adjusts the award "either upward or downward to reflect factors not already taken into consideration." *Ross v. State Farm Mut. Auto. Ins. Co.*, 82 Wn. App. 787, 800, 919 P.2d 1268 (1996), *rev'd on other grounds*, 132 Wn.2d 507, 940 P.2d 252 (1997); *Bowers*, 100 Wn.2d at 598-99. We review a trial court's decision to apply a multiplier to a lodestar attorney fee for abuse of discretion. *Boeing Co. v. Heidy*, 147 Wn.2d 78, 90-91, 51 P.3d 793 (2002).

¶87 Examining findings of fact one and two, it is clear that the trial court evaluated the reasonableness of the plaintiffs' attorneys' hourly rates with other similarly situated attorneys. In fact, the trial court noted, "There was no evidence offered to suggest that the rates charged by Plaintiffs' counsel were unreasonable." CP at 5. Further, the trial court noted that these rates were consistent with those charged by other lawyers in the Puget Sound area. In using such a large geographic area for measuring reasonableness, the trial court noted that very few attorneys in the Puget Sound area would take a case of this nature and that it would be unreasonable to limit the plaintiffs to using an attorney from Mason or Thurston County. The County does not challenge these findings, and we conclude that the trial court acted reasonably in setting the hourly rate and did not abuse its discretion.

¶88 Examining findings 9, 10, and 11, it is clear that the trial court applied two appropriate factors in concluding that a lodestar multiplier was appropriate. It found that "this representation significantly impacted the ability of the lead lawyers to work on other matters and constituted a significant risk to Plaintiffs' law firm if it did not recover

fees." CP at 8. It noted that this was a unique and complex case requiring a high degree of skill and preparation and that the firm took the case on a contingency basis. CP at 8.

¶89 The County does not challenge these findings, and we conclude that they support the application of a lodestar multiplier. The trial court did not rely on these same factors in determining the reasonableness of plaintiffs' counsels' hourly rate; it appropriately applied them in assessing the risk to the firm and in assessing the necessary skill level for taking such a case on a contingency basis. *See Scott Fetzer Co.*, 122 Wn.2d at 150 (Although the foundation of the award is built on objective criteria, the trial court may adjust the award to account for subjective factors, including " 'the time expended, the difficulty of the questions involved, the skill required, customary charges of other attorneys, the amount involved, the benefit resulting to the client, the contingency or certainty in collecting the fee and the character of the employment.' " (quoting *Scott Fetzer Co. v. Weeks*, 114 Wn.2d 109, 124, 786 P.2d 265 (1990))); *Bowers*, 100 Wn.2d at 598-99 (The court can adjust the lodestar on two bases: to account for the risk factor in the case or to reflect the attorney's quality of work.).

VI. ATTORNEY FEES ON APPEAL

¶90 Respondents request attorney fees and costs on appeal. We grant that request in an amount a commissioner of this court will determine upon respondents' compliance with RAP 18.1(d).

¶91 We affirm.

HOUGHTON and ARMSTRONG, JJ., concur.